SAVAGE, YEATES & WALDRON, P.C.
E. Scott Savage (2865)
Stephen R. Waldron (6810)
170 South Main Street, Suite 1075
Salt Lake City, Utah 84101
Phone: (801) 328-2200
Email: ssavage@sywlaw.com

R. Joseph Trojan (pro hac vice)
trojan@trojanlawoffices.com
Dylan C. Dang (pro hac vice)
dang@trojanlawoffices.com
Francis Wong (pro hac vice)
wong@trojanlawoffices.com
TROJAN LAW OFFICES
9250 Wilshire Blvd., Suite 325
Beverly Hills, CA  90212
Telephone:   310-777-8399
Facsimile:   310-777-8348
*Attorneys for Defendant,*
*HEARTWISE, INC.*
*d/b/a NATUREWISE*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| VITAMINS ONLINE, INC. a Delaware corporation,<br><br>Plaintiff,<br>v.<br><br>HEARTWISE, INC., an Oregon Corporation d/b/a NATUREWISE,<br><br>Defendant. | CASE NO. 2:13-cv-00982-DAK-JCB<br><br>**DEFENDANT'S MOTION FOR JUDGMENT ON PARTIAL FINDINGS PER F.R.C.P. 52(c)**<br><br>**Judge Dale A. Kimball** |

## Table of Contents

PAGE

I.  INTRODUCTION ...................................................................................................1

II.  LAW ON RULE 52(c) ...........................................................................................5

III.  JUDGMENT ON PLAINTIFF'S LANHAM ACT CLAIM FOR LACK OF STANDING
     AS TO THE INGREDIENT CLAIMS.................................................................6

IV.  JUDGMENT ON PLAINTIFF'S LANHAM ACT CLAIM FOR FAILURE TO PROVE
     INJURY ..................................................................................................................9

     A. The Amazon Weight Loss Market Was Not a Two-Player Market Based on Amazon
     Rankings ......................................................................................................................9

     B. The Amazon Weight Loss Market Was Not a Two-Player Market Based on
     "Conquesting" ...........................................................................................................12

     C. The Amazon Weight Loss Market Was Not a Two-Player Market Based on 'Non-
     Generic' Ingredients .................................................................................................12

     D . No Correlation ..................................................................................................14

        1. No Correlation Between NutriGold's Declining Sales and NatureWise's Sales ..........15

        2. No Correlation re Green Coffee Sales................................................................17

        3. No Correlation re Garcinia Cambogia Sales ......................................................18

     E. Intervening Factor #1: Third Party Competition Due to the Oz Effect ..........................19

        1. The Oz Effect .....................................................................................................19

        2. The Oz Effect Caused the Supplement Market to be Flooded with Competitors .........20

        3. Both NutriGold Sales and NatureWise Sales Fell as the Oz Effect Waned.................21

     F. Intervening Factor #2: Pricing.............................................................................22

     G. Intervening Factor #3: Poor Ratings..................................................................24

     H. No Evidence of Nexus..........................................................................................26

        1. No Consumer Testimony Evidence to Establish a Nexus ..............................................26

2. No Survey Evidence for the Ingredient Claims.................................................26

3. Dr. Belch's Testimony on the Review Survey ...........................................27

V.    NO EVIDENCE TO SUPPORT A PERMANENT INJUNCTION ...............................29

      A.  No Injunction for the Ingredient Claims ........................................30

      B.  No Injunction for the Review Claims...............................................31

VI.   JUDGMENT ON THE UNFAIR COMPETITION CLAIM ...........................................32

VII.  CONCLUSION .................................................................................33

## Table of Authorities

**Cases**

*Am. Steel Foundries v. Tri-City Cent. Trades Council*, 257 U.S. 184, 201, 42 S. Ct. 72, 75, 66 L. Ed. 189 (1921) ....................................................................................................................5

*Buhl v. Davis*, No. 14-CV-00302-REB-CBS, 2016 WL 890034, at *3 (D. Colo. Jan. 26, 2016).32

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837, 1839, 164 L. Ed. 2d 641 (2006) ..........................................................................................................................31

*Enzymotec Ltd. v. NBTY, Inc.*, No. 08-CV-2627 ADS ETB, 2011 WL 2601500, at *6 (E.D.N.Y. June 29, 2011) ...................................................................................................................9

*Feliciano v. Rullán*, 378 F.3d 42, 59 (1st Cir.2004), cert. denied, 543 U.S. 1054 (2005) .............6

*Lippoldt v. Cole*, 468 F.3d 1204, 1217 (10th Cir. 2006) ...................................................5

*Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1139 (4th Cir.1993) ....................................8

*Nieto v. Kapoor*, 268 F.3d 1208, 1217 (10th Cir. 2001) ...................................................6

*PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1113 (2d Cir.1997) ...............................8

*PhotoMedex, Inc. v. Irwin,* 601 F.3d 919, 924 (9th Cir.2010) .........................................8

*Proctor & Gamble Co. v. Haugen*, 947 F. Supp. 1551, 1554 (D. Utah 1996) ...............34

*Rachel v. Troutt*, No. CIV-15-141-R, 2017 WL 1437890 (W.D. Okla. Apr. 21, 2017) ..............32

*Rachel v. Troutt*, No. CIV-15-141-R, 2017 WL 1440007, at *5 (W.D. Okla. Feb. 10, 2017)......32

*Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006) ........................................6

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 231, fn. 10 (3d Cir. 1990)...........9

*Sandoz Pharms. Corp. v. Richardson–Vicks, Inc.,* 902 F.2d 222, 230 (3d Cir.1990)....................9

*Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1054 (C.D. Cal. 2013) ............28

*Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951, 204 L. Ed. 2d 305 (2019) 10

*Vitamins Online, Inc. v. Heartwise, Inc.*, 2016 WL 538458, at *9 ...............................31

*Vitamins Online, Inc. v. HeartWise, Inc.*, 2019 WL 6682313, at *13..........................34

*Vitamins Online, Inc. v. Heartwise, Inc.*, No. 2:13-CV-982-DAK, 2016 WL 538458, at *8 (D. Utah Feb. 9, 2016) ..................................................................................................2, 16

**Statutes**
21 U.S.C.A. § 337 ....................................................................................................................8
Fed.R.Civ.P. 52(c) ..................................................................................................................6

**Others**
*Moore's Federal Practice* § 52.50 [2] ...................................................................................6

## I.   INTRODUCTION

Pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, Defendant HeartWise, Inc., dba NatureWise ("NatureWise"), respectfully moves for entry of judgment against Plaintiff Vitamins Online ("Vitamins Online") on all claims because (1) Plaintiff has failed to prove that it suffered harm because of the alleged false advertising; (2) there is no standing with respect to the Ingredient and label claims; and (3) the request for injunctive relief is stale because the complained of conduct ended six years ago.

At the filing of this brief, NatureWise has received the trial transcript through July 28.   The received transcripts are quoted, but for the testimony after that date, references to testimony are made based upon memory.

In its opening, Vitamins Online stated it would prove to the Court that it is entitled to *$44 million* in damages.  (7/17/20 Trial Tr. at 6:1-4.)  Given the tens of millions at stake, Vitamins Online especially needed to prove—with hard evidence—that it was injured by the accused advertising.  2019 WL 6682313, at *12 (A "heightened level of ... proof of causation and specific injury" is required when the plaintiff is seeking money damages in order to "prevent the plaintiffs from receiving a windfall unrelated to their own damages.").  Yet, Vitamins Online offered little more than the speculations of its Chief Financial Officer, Mr. Osman Khan, who blamed NatureWise for Vitamins Online's collapse in the market.  It was incumbent on Vitamins Online's experts to explain how NatureWise caused its claimed injury.  Though Vitamins Online presented five experts, none of them testified on the crucial issue of causation.

In particular, Dr. Michael Belch testified on a survey he conducted to determine the importance of reviews to Amazon consumers as a general matter (7/27/20 Trial Tr. at 1315:17-

22).   In the February 9, 2016 Summary Judgment Order, this Court noted that Vitamins Online would need to do consumer surveys to establish causation for its alleged injury:

> Vitamins Online needs more than a logical causal connection between NatureWise's false representations and Vitamins Online's sales position. For example, Vitamins Online could have provided additional evidence through consumer testimony **or consumer surveys** to strengthen the causal connection between the representations and the lost sales.

*Vitamins Online, Inc. v. Heartwise, Inc.*, No. 2:13-CV-982-DAK, 2016 WL 538458, at *8 (D. Utah Feb. 9, 2016).   Yet, Dr. Belch did not ask participants in the survey whether NatureWise's reviews or star ratings would cause them to buy NatureWise's products rather than Vitamins Online's products.   (7/27/20 Trial Tr. at 1345:1-16; 1358:11-21.)   Even when the star ratings were adjusted by Mr. Noonan to exclude suspicious reviews, NatureWise's star rating remained a whole star above Plaintiff's rating for three products and a half star above the fourth product.   If Consumers pick based upon the highest rating, they would still pick NatureWise even after adjusting for allegedly suspicious reviews.   Having no survey evidence of injury at trial, Vitamins Online fell back again on its presumption of injury arguments, which the Court rejected four years ago.

Further, Dr. Belch did not conduct a survey on the Ingredient claims.   (7/27/20 Trial Tr. at 1360;19-21; 1367:17-19.)   Though these products have been competing in the marketplace for seven years, generating thousands of reviews (*see e.g.* Trial Exs. 374 and 381), Dr. Belch did not point to one review to show that a consumer chose NatureWise's products over Vitamins Online's products because of any particular Ingredient claim.   (7/27/20 Trial Tr. *passim*.)   Considering other competitors were making the same claims, it is impossible to know whose product would be purchased.

On the last day of its case in chief, Vitamins Online offered the testimony of Dr. Stan Smith, who testified on his accounting of the parties' sales, comparing Vitamins Online's sales

with NatureWise's sales.  Dr. Smith argued that there was a correlation between the sales of the two parties.  (7/30/20 Trial Tr. *passim*.[1])  But he admitted that he could not identify the cause of Vitamins Online's lost sales.  (*Id*.)  Dr. Smith admitted he did not analyze how NatureWise could have caused injury to Vitamins Online if the Court's finding that this case does not involve a two-player market is followed.  (*Id*.)  Nor did he analyze all the most obvious intervening factors that would likely explain plaintiff's lost sales such as pricing, low review ratings, the fading of the Oz effect, or the intensity of competition from multiple other players.  (*Id*.)

None of Vitamins Online's experts talked about injury because there is no evidence of it. This is because the dietary supplement market is an *intensely* competitive, with hundreds of competitors offering thousands of products.[2]  In such a crowded market, with competitors all making more or less the same claims about Green Coffee and Garcinia Cambogia, nothing that NatureWise did could have caused Vitamins Online's sales to drop through the floor and stay there for the last seven years.  As just one among hundreds of sellers, NatureWise's accused advertising—*e.g.*, giving away free samples to incentivize reviews for *its own products*, boosting the helpfulness of reviews of *its own products*, and making claims about the ingredients of *its own products*—could not have had the force to make Vitamins Online's sales fall as precipitously as it did.

The reason that Vitamins Online's sales fell so sharply was because the market itself had changed overnight and Vitamins Online failed to keep up with the new reality of intense competition from all sides.  As the Green Coffee and Garcinia Cambogia markets became flooded

---

[1] NatureWise was not able to obtain a copy of the 7/30/20 Trial Transcript to provide citation at the time of the filing of this motion.
[2] *See* 7/17/20 Trial Tr. at 134:15-17: "... among hundreds of hundreds of Garcinia that might be available Amazon" and 256:14-15: "... I had hundreds of competitors to worry about."; *see also* Trial Ex. 627.

with competitors on the heel of the Dr. Oz shows (7/17/20 Trial Tr. at 76:6-7), Vitamins Online did nothing to stay competitive.  Vitamins Online's products were always more expensive.  (*See e.g.*, Trial Exs. 27, 65, 137, 158.)  Worse, its products persistently had mediocre reviews.  (*See. e.g.*, Trial Ex. 65.)  This is why Vitamins Online's sales flatlined for the last seven years, even as different competitors besides NatureWise leapfrogged over Vitamins Online to climb to the top of the Green Coffee and Garcinia Cambogia markets.  (Trial Ex. 5165.)  All the evidence at trial show that Vitamins Online lost sales because of *its own failure* to stay competitive in the volatile dietary supplement market.

In short, after 10 days of trial, Vitamins Online has not shown it is entitled to even one dollar of damages; therefore, the Court should grant judgment on Vitamins Online's disgorgement claim.

The Court should also grant judgment on Vitamins Online's injunction claim.  Vitamins Online failed to establish that it is entitled to an injunction as to the Ingredient claims because the current Ingredient claims are true and accurate.  Whatever problems NatureWise had with the Ingredient claims in 2013, it proactively addressed those issues by testing and transforming its procedures.  Its manufacturer at the time, PLN, had misrepresented the quality of some of the products in 2013, but those problems were fixed in 2014 when NatureWise implemented standard operating procedures and switched manufacturer to Robinson Pharma and ANS.  Vitamins Online has not shown that any of NatureWise's products after 2014 have failed any testing.  (7/29/20 Trial Tr. *passim*.[3])  Since Vitamins Online has not demonstrated any likelihood of irreparable harm from the current Ingredient claims, there is no basis for an injunction as to those claims.

---

[3] NatureWise was not able to obtain a copy of the 7/29/20 Trial Transcript to provide citation at the time of the filing of this motion.

As to the Review claims, Vitamins Online apparently seeks to retroactively remove all of NatureWise's existing reviews, including the vast majority of reviews that are not accused of being incentivized or boosted.  The Supreme Court teaches that an "injunction operates in futuro…." *Am. Steel Foundries v. Tri-City Cent. Trades Council*, 257 U.S. 184, 201, 42 S. Ct. 72, 75, 66 L. Ed. 189 (1921); *Lippoldt v. Cole*, 468 F.3d 1204, 1217 (10th Cir. 2006) (As a general rule, to have standing to seek prospective relief, including an injunction, a plaintiff "must show more than past harm or speculative future harm.")  Since Vitamins Online has not shown that it will be irreparably harmed by NatureWise's *past* reviews, injunctive relief on the Review claims is also not warranted.

## II.     LAW ON RULE 52(c)

Rule 52 provides:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed.R.Civ.P. 52(c). *Nieto v. Kapoor*, 268 F.3d 1208, 1217 (10th Cir. 2001) ("A motion for judgment made in a trial to the court at the close of the plaintiffs' evidence is now governed by Fed.R.Civ.P. 52(c), which requires the court to make findings of fact and conclusions of law if it grants the motion.").

Rule 52(c) expressly authorizes the district judge to resolve disputed issues of fact.[4] In deciding whether to enter judgment on partial findings under Rule 52(c), *the district court is not required to draw any inferences in favor of the non-moving party*; rather, the district court may

---

[4] *See* Fed.R.Civ.P. 52(a) ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous.").

make findings in accordance with its own view of the evidence. *See, e.g.*, *Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006).

Pursuant to Rule 52, the Court should enter judgment on all of Vitamins Online's claims now that it has been fully heard because it is manifestly clear that Vitamins Online has not and cannot prove its case. *Feliciano v. Rullán*, 378 F.3d 42, 59 (1st Cir.2004), cert. denied, 543 U.S. 1054 (2005) ("When a party has finished presenting evidence and that evidence is deemed by the trier insufficient to sustain the party's position, the court need not waste time, but, rather, may call a halt to the proceedings and enter judgment accordingly."). *See also Moore's Federal Practice* § 52.50 [2]. Rule 52(c) "conserves time and resources by making it unnecessary for the court to hear evidence on additional facts when the result would not be different even if those additional facts were established." *Id*. The Court should enter judgment on Vitamins Online's claims for the following reasons:

## III.    JUDGMENT ON PLAINTIFF'S LANHAM ACT CLAIM FOR LACK OF STANDING AS TO THE INGREDIENT CLAIMS

In Plaintiff's opening statement, Vitamin's Online claimed that NatureWise "swooped in and he took millions of dollars of sales by intentionally and blatantly manipulating the Amazon products,…by making other false claims about his products which were **in violation of multiple FDA rules and regulations**." (7/16/20 Trial Tr. at 9:5-11. (emphasis added)  Vitamins Online's expert, Dr. Norman Howe, testified that NatureWise's Ingredient claims and label claims were false because they violated FDA regulations, in particular 21 C.F.R. ¶111, et seq.  (7/29/20 Trial

Tr. *passim*.[5])     Dr. Howe confirmed on cross-examination that his findings concerning all ingredient and label claims were based upon violations of the FDA regulations.

Now that Plaintiff's case-in-chief has closed, it is clear that all ingredient claims are based upon alleged violations of the FDA regulations.   Vitamins Online does not have standing to assert such claims because the FDA has exclusive jurisdiction to enforce its regulations.   Title 21 of U.S.C.A. at Section 337 states that:

> Except as provided in subsection (b), all such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the **name of the United States**….

21 U.S.C.A. § 337.   The only exception is subsection (b), which provides for the States to have jurisdiction to enforce certain parts of the regulations.

There does not appear to be any Tenth Circuit case addressing § 337, but the Ninth Circuit holds that the Lanham Act cannot be used as a vehicle for a private party to acquire jurisdiction to enforce the FDA regulations.   As the Ninth Circuit teaches, "**Because the FDCA forbids private rights of action under that statute, a private action brought under the Lanham Act may not be pursued** when, as here, the claim would require litigation of the alleged underlying FDCA violation in a circumstance where the FDA has not itself concluded that there was such a violation." *PhotoMedex, Inc. v. Irwin,* 601 F.3d 919, 924 (9th Cir. 2010)(emphasis added).

Judge Spatt in the Southern District of New York cited to *PhotoMedex, Inc* when refusing to permit private enforcement of FDA regulations under the guise of a Lanham Act claim.   In addition to citation to the Ninth Circuit, Judge Spatt conducted a legal survey of the Second Circuit,

---

[5] NatureWise was not able to obtain a copy of the 7/29/20 Trial Transcript to provide citation at the time of the filing of this motion.

Third Circuit, and Fourth Circuit, finding that all these circuits have concluded that the FDA has exclusive jurisdiction to enforce its own regulations:

> Enzymotec's cannot gain Lanham Act standing by attempting to privately enforce the FDCA. *See PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1113 (2d Cir.1997) (holding "that Friedlander lacks standing to sue PDK under § 43(a) of the Lanham Act" because "Friedlander's dogged insistence that PDK's products are sold without proper FDA approval suggests ... that Friedlander's true goal is to privately enforce alleged violations of the FDCA."); *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1139 (4th Cir.1993) (holding that because the appellant may not independently enforce the FDCA, it also may not use the Lanham Act "as a vehicle by which to enforce the [FDCA]"); *Sandoz Pharms. Corp. v. Richardson–Vicks, Inc.,* 902 F.2d 222, 230 (3d Cir.1990) (holding that a Lanham Act false labeling claim does not exist against a manufacturer who failed comply with the FDCA's labeling requirements).

*Enzymotec Ltd. v. NBTY, Inc.*, No. 08-CV-2627 ADS ETB, 2011 WL 2601500, at *6 (E.D.N.Y. June 29, 2011). The Third Circuit further instructs, "[Plaintiff] is free to petition the FDA to investigate these alleged labeling violations…The fact that it has been unable to get a quick response from the FDA, however, does not create a claim for [Plaintiff] under the Lanham Act." *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 231, fn. 10 (3d Cir. 1990) (internal citation omitted).

Since all of the Ingredient and label claims are predicated on Dr. Howe's contention that they violate FDA regulations, Vitamins Online does not have standing to assert such claims because such claims can only be brought in the name of the United States or a State. Therefore, the Court must dismiss the Ingredient and label claims because they are all based upon violations of the FDA regulations.

The Supreme Court holds that standing is not waived because it is jurisdictional. The Court teaches, "As a jurisdictional requirement, standing to litigate cannot be waived or forfeited. And when standing is questioned by a court or an opposing party, the litigant invoking the court's

jurisdiction must do more than simply allege a nonobvious harm. See *Wittman v. Personhuballah*, 136 S.Ct. 1732, 1736–1737, 195 L.Ed.2d 37 (2016).  To cross the standing threshold, the litigant must explain how the elements essential to standing are met." *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951, 204 L. Ed. 2d 305 (2019).  Therefore, the ingredient and label claims must be dismissed because there is no private cause of action to enforce the FDA regulations, even when masquerading as a Lanham Act claim.

## IV.   JUDGMENT ON PLAINTIFF'S LANHAM ACT CLAIM FOR FAILURE TO PROVE INJURY

The Court should enter judgment on Vitamins Online's $44-million disgorgement claim because it did not show it was injured by losing even one sale due to the accused advertising. Vitamins Online's disgorgement claim hinges on the premise that the Green Coffee and Garcinia Cambogia markets are two-player markets, which the Court has previously twice rejected.[6]  Since Vitamins Online failed to show at trial that the Green Coffee and Garcinia Cambogia markets on Amazon are two-player markets, it could not establish injury.

### A.   The Amazon Weight Loss Market Was Not a Two-Player Market Based on Amazon Rankings

As Mr. Khan testified, there have been hundreds, if not thousands, of competitors in the Green Coffee and Garcinia Cambogia markets on Amazon offering thousands of products: "So under weight loss category of Amazon there would literally be *tens of thousands* of products"

---

[6] This competition-based argument is the same as what Vitamins Online had argued in its summary judgment motion, which the Court rejected: "[T]he court is unconvinced that the parties are involved in a sparsely populated market.…The court therefore rejects Vitamins Online's competition-based arguments for a presumption of injury." *Vitamins Online, Inc.*, 2019 WL 6682313, at *13–14.

(7/16/20 Trial Tr. at 179:24-25 (emphasis added)), and "We just lost our competitive advantage that we had over *hundreds* of others" (*id*. at 181:22-23).

Ignoring the reality of the crowded weight loss market on Amazon, Vitamins Online tries to make it a two-horse race, arguing that Vitamins Online and NatureWise were jockeying for the top ranking on Amazon in 2013. But the Amazon market for weight loss products, including Green Coffee or Garcinia Cambogia products, was and is not a two-player market just because at one brief point at the end of 2013 Vitamins Online and NatureWise had occupied the top positions on Amazon's sales (Trial Exs. 27 and 88) and search results rankings (Trial Exs. 65, 137, 158, 5146, 5147).

By Plaintiff's logic, every market could be defined as a two-player market based on selective rankings. It is illogical to define any market based on rankings that can change from month to month or even day by day. Indeed, if the weight loss supplement market were defined as a two-player market based on the top-two ranking products, then by its own account Vitamins Online was no longer in this market when it fell from the top of the ranking, which means that it could not have lost sales to NatureWise after 2013 (Trial Ex. 65.3).

Moreover, Vitamins Online's reliance on Amazon "rankings" to define the weight loss supplement market is also deeply flawed for two additional reasons. The first reason is that Amazon "rankings" does not correlate to a seller's share of the weight loss supplement market because the "rankings" can change depending on the variables used to conduct searches, which the seller has no control over. If the weight loss supplement market were defined by Amazon rankings, there would be a different "market" every time a different search is conducted using different parameters.

Thus, Vitamins Online's argument that consumers only had a binary choice between Vitamins Online and NatureWise because they were briefly the top two ranked competitors on Amazon in 2013 does not make sense.  Amazon consumers could choose from hundreds of alternatives, which they could easily find by modifying search parameters.  (7/17/2020 Trial Tr. at 385:9-12.)  Even if consumers only looked at the first and second pages of Amazon's listed products by rank, they would see dozens of other products.  (*See e.g.*, Trial Exs. 27, 65, 88, 137, and 158.)  The proof that Amazon consumers had more than a binary choice is the fact that other competitors took over the top of the rankings.

The second reason that Vitamins Online's reliance on Amazon "rankings" is flawed is that the "rankings" are not an accurate and complete measure of the market because the "rankings" were based on only two snapshots taken from the Wayback Machine in 2013.  (7/17/20 Trial Tr. at 341:20 – 347:1; Trial Exs. 5146, 5147.)  Mr. Khan admitted that he selectively took only two snapshots from the Wayback Machine showing Vitamins Online and NatureWise occupying the two top positions on Amazon.  However, snapshots taken at other times show numerous other competitors jockeying for the top positions, with Vitamins Online falling to a ranking of 10 or 11. (Trial Exs. 5146, 5147.)  The very fact that Vitamins Online fell out of the top of the charts as other competitors leapfrogged over it shows that the market was not a two-player market and that consumers were not limited to choosing between just Vitamins Online and NatureWise.  In fact, Vitamins Online tumbled out of the top ranking and remained at the bottom of the market for more than five years.  If ranking were an accurate measure of the market, then by Vitamins Online's own arguments it cannot show that it was competing with NatureWise after it fell out of the top ranking, and thus it was not harmed by NatureWise.

**B.     The Amazon Weight Loss Market Was Not a Two-Player Market Based on "Conquesting"**

Vitamins Online also argues that the weight loss supplement market is a two-player market because Amazon has a feature called "Customers Who Viewed This Item Also Viewed." (Trial Ex. 374.2.) Mr. Khan testified that this feature shows "customers who viewed my product [NutriGold] also viewed these other products. It's as simple as that." (7/17/2020 Trial Tr. at 136:7-9.) Vitamins Online argues that this feature shows a direct comparison between the products because NatureWise's products shows up on Vitamins Online's product page as shown in the screenshot below:



(Trial Exhibit 374.2.)

The screenshot itself shows that Vitamins Online's product is not compared only to NatureWise's product, but also other products offered by the parties in competition with both Vitamins Online and NatureWise. Hence, consumers were not limited to a "binary" choice between just Vitamins Online's product and NatureWise's product.

**C.     The Amazon Weight Loss Market Was Not a Two-Player Market Based on 'Non-Generic' Ingredients**

Vitamins Online's claim of injury based on the Ingredient claims is similarly predicated on the contention that the Green Coffee and Garcinia Cambogia markets are two-player markets.

12

Though Mr. Khan repeatedly testified that there are hundreds, if not thousands, of Green Coffee and Garcinia Cambogia sellers on Amazon, he tries to draw a distinction between 'generic' products and 'non-generic' products:

> ….There are hundreds of generic Garcinia or generic green coffee sellers. There were legitimate, you can call it competitors if you will, but they did not have what the consumers were looking for. So they were just fine. I never worried about them. They were there, they were lowering the search results. They did not have any distinguishing features and they were too numerous.

(7/17/20 Trial Tr. at 381:20 – 382:5.)

Mr. Khan's attempt to draw a distinction between 'generic' products and 'non-generic' (*i.e.* name brand) products is baseless.  Consumers could see, compare, and choose among a multitude of 'generic' and 'non-generic' products alike as these are fungible products.  For example, when a consumer does a search on Amazon for Green Coffee supplements, both 'generic' and 'non-generic' products are featured.   (Trial Exs. 65.4-65.4, 137, and 158.)   There is no market delineation between 'generic' and 'non-generic' products because there is no evidence that consumers do not compare both and always choose one to the exclusion of the other.   Notably, Vitamins Online did not present a survey to support Mr. Khan's delineation between 'generic' products and 'non-generic' products and how that distinction mattered to consumers. consumers purchase both.  To say that consumers who name brand products do not also buy generic products is contrary to common sense market behavior.  In fact, consumers have more incentive to buy 'generic' products because they are typically cheaper.

Further, sellers often sell both 'generic' and 'non-generic' products.  NatureWise itself started out selling 'generic' Green Coffee products before later launching its Svetol Green Coffee products.  Similarly, NatureWise started out selling 'generic' Garcinia Cambogia products before later selling SuperCitrimax Garcinia Cambogia products.

Even if a market for 'non-generic' supplements could be discerned, it would not be a two-player market.  This is because even among so called 'non-generic' products, there were numerous competitors making the same claims about having Svetol and SuperCitrimax.  (Trial Exs. 65.4-65.4, 137, and 158.)

No matter Vitamins Online's artificial distinction between 'generic' and 'non-generic' products, NatureWise's products were hardly distinguishable from other competitors because they were making more or less the same claims about Green Coffee and Garcinia Cambogia based on the characteristics that Dr. Oz had highlighted.  (Trial Exs.  42.2, 104, 315.12, 627.)  There is not a shred of evidence that consumers purchased NatureWise's products because of any specific claim about its ingredients that are different from claims made by other competitors.

In short, the Green Coffee and Garcinia Cambogia markets are not two-player markets. Therefore, Vitamins Online had to show it was directly injured by NatureWise's accused advertising and not by the hundreds of other competitors in the Green Coffee and Garcinia Cambogia markets.

### D.     No Correlation

To prove direct injury in such crowded markets, Vitamins Online had to show that there is a close "correlation" or logical, temporal causal connection between its alleged lost sales and NatureWise's accused advertising, *and*, a "nexus"[7] between its lost sales and the accused

---

[7] To show such a "nexus," Vitamins Online must present direct evidence of "consumer testimony" showing consumers switched from Vitamins Online's supplements to NatureWise's supplements because of the accused advertising, or indirect evidence in the form of surveys showing that consumers would switch from Vitamins Online's supplements to NatureWise's supplements because of the accused advertising. *Vitamins Online, Inc. v. Heartwise, Inc.*, 2016 WL 538458, at *8 ("Vitamins Online could have provided additional evidence through consumer testimony or consumer surveys to strengthen the causal connection between the representations and the lost sales.").

advertising.  *Vitamins Online, Inc. v. Heartwise, Inc.*, 2016 WL 538458, at *8.[8]  Vitamins Online

failed to prove correlation or nexus.

        1.        **No   Correlation   Between   NutriGold's   Declining   Sales   and NatureWise's Sales**

At trial, Vitamins Online argued that its sales declined when NatureWise entered the

market, suggesting there is a "correlation"[9] between NatureWise's accused conduct and Vitamins

Online's claimed injury.  However, Vitamins Online focused on just <u>one</u> month, September 2013,

when NatureWise's sales skyrocketed and Vitamins Online's sales tailspinned.  (Demonstrative

Trial Ex. 580[10].)  For ease of reference, the parties' sales in dollars up to October 2013 as

summarized in Trial Ex. 580 are depicted in the following graph:

---

[8] *See also*, *Labware, Inc. v. Thermo Labsystems, Inc.*, No. CIV.A.04-2545, 2005 WL 1541028, at *12 (E.D. Pa. June 29, 2005) ("Actual damages cannot exist without a nexus between a false advertisement and an adverse purchasing decision." (emphasis added));;.

[9] "Correlation" is not "causation." *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1220–21 (10th Cir. 2016) (noting that a temporal relationship is "a necessary *but not sufficient condition for causation*" (internal quotations omitted; emphasis added)).

[10] This exhibit was not admitted into evidence and referenced only to rebut Vitamins Online's argument.



As shown in the graph, there is no correlation between Vitamins Online's sales and NatureWise's sales *before* or *after* September 2013.  Vitamins Online's sales (for both Green Coffee and Garcinia Cambogia) moved up and down from October 2012 to May 2013, rising suddenly and peaking in June 2013, then started to fall again, taking a sharp turn downwards in September 2013.  On the other hand, NatureWise's sales only started to take off in July 2013 and continued to rise through September 2013.   In other words, there was no correlation between the parties' sales before September 2013.

There is also no correlation between the parties' sales after September 2013. Tellingly, Vitamins Online makes no effort to show the sales trends after September 2013.  When long-term sales from after September 2013 to 2016 are examined, it is clear that there is no correlation as explained below.

16

2.      **No Correlation re Green Coffee Sales**

Based on the data compiled by Dr. Smith, both Vitamins Online's and NatureWise's long-term sales for Green Coffee declined and declined according to very different trends:



(Demonstrative Trial Ex. 579[11]; 5110.010.)  Dr. Smith could not demonstrate any correlation in the sales of Green Coffee.  He could not explain why Vitamins Online's sales did not go down when NatureWise's sales went up, or, conversely, why Vitamins Online's sales did not go up when NatureWise's sales went down.

More particularly, Demonstrative Trial Ex. 5110.010 shows that Vitamins Online's sales for Green Coffee had already started to plummet in Q4/2012, and by a year later, in Q4/2013, its sales were anemic. NatureWise's own Green Coffee sales fell steadily, if not as sharply, after Q1/2013.  If NatureWise was taking sales from Vitamins Online in 2012, 2013, 2014, and so on,

---

[11] This exhibit was not admitted into evidence and referenced only to rebut Vitamins Online's argument.

Vitamins Online's sales would have rebounded in direct correlation to NatureWises's declining sales.  But there is no such correlation.

For example, NatureWise's sales fell from 66,929 to 4,568, *a drop of more <u>than 60,000 units</u>*, between Q1/2013 and Q1/2015.  (Trial Ex. 579.)  Yet, *Vitamins Online's sales were nearly negligible even as NatureWise's sales were dropping precipitously.*  (*Id*.)  Indeed, between the first and second quarters of 2016, *NatureWise's sales fell <u>below</u> Vitamins Online's sales*, yet Vitamins Online's saw no discernable increase in its sales.  (*Id*.)  This shows that there was no "correlation," much less a causal relationship, between the parties' sales of Green Coffee supplements.

### 3.     No Correlation re Garcinia Cambogia Sales

Again based on the data compiled by Dr. Smith, a similar comparison of Vitamins Online's sales with NatureWise's sales shows there is no correlation between the alleged injury and the accused advertising for Garcinia Cambogia:



(Demonstrative Trial Ex. 578[12]; 5110.009.)  As shown in the chart, NatureWise's sales fluctuated as Vitamins Online's sales generally decreased.  (Demonstrative Trial Ex. 578.)   Again, Dr. Smith did not explain why Vitamins Online's sales did not go up when NatureWise's sales went down if NatureWise was taking sales from Vitamins Online.

The lack of any correlation between the parties' sales from 2012 to 2016 is proof that there is no injury.  But even if one were to focus on the few months at the end of 2013, the fact that Vitamins Online's sales declined is not indicative of injury because the evidence at trial indicates that Vitamins Online lost sales due to other intervening factors.

### E.     Intervening Factor #1: <u>Third Party Competition</u> Due to the Oz Effect

The most obvious reason why Vitamins Online began to lose sales at the end of 2013 is because the market became flooded with competitors, who all chipped away at Vitamins Online's sales.

#### 1.     The Oz Effect

Mr. Magleby stated in his opening:

> You will hear that in March of 2012 Dr. Oz, a television personality who promotes among other things, … health and wellness, … did a segment on green coffee. And later he did a segment on Garcinia. And … Vitamins Online sales skyrocketed or at least for a time.

(7/16/20 Trial Tr. at 8:12-19.)  Mr. Khan then explained the how the Oz Effect was so powerful that it drove sales across the market:

- "We had an extremely high demand because we had a lot of customers after Dr. Oz's shows." (*Id*. at 76:6-7.)

- "And he had a huge following. He could move markets."  (*Id*. at 157:10-11.)

---

[12] This exhibit was not admitted into evidence and referenced only to rebut Vitamins Online's argument.

- "As always his recommendations increased sales significantly." (*Id*. at 159:5-6.)

In fact, Mr. Khan explained that the Oz Effect was so powerful that it would "drive markets to pretty much all of the products," generating billions in sales:

> A.     ….The Oz effect is known in our industry really well because just a mention by him would really drive markets to pretty much all of the products. So he was responsible for bringing to our industry at least a few billion dollars in sales.
>
> Q.     A few billion?
>
> A.     Correct.
> ***
> A.     ….I imagine he brought in at least 40, $50 billion worth of sales to our industry as a whole.

(7/17/20 Trial Tr. at 399:16 – 400:10.)  It was the tsunami of competition created by the Oz Effect that fundamentally shifted the market, the tide of which eventually pulled Vitamins Online under. NatureWise simply did not have the market power to harm Vitamins Online.

### 2.     The Oz Effect Caused the Supplement Market to be Flooded with Competitors

The Oz Effect caused a flood of competitors to enter the supplement market to take advantage of the increased demand.  Mr. Khan testified that "I had hundreds of competitors to worry about…." (7/17/20 at 256:14-16), and "almost a year later for context between Dr. Oz Show and by the time NatureWise launched, there were lots of generic Garcinia products in the marketplace…"  (*id*. at 266:22-23; Trial Exhibit 374.2[13]).

---

[13] *See also* Trial Exs. 65, 137, 158, 5146, 5147 for Green Coffee Products.

### 3.     Both NutriGold Sales and NatureWise Sales Fell as the Oz Effect Waned

As the Oz Effect waned over time, the demand for Green Coffee supplements naturally decreased.  Mr. Khan testified:

> Q.     So with respect to the Garcinia products, isn't it true that the Oz effect faded over time?
>
> A.     To some level, yes. From the peak, I would certainly agree with you on that --
>
> Q.     And so --
>
> A.     -- that that faded.
>
> ***
>
> Q.     Okay. But you do agree that the Oz effect with respect to the Garcinia product faded over time, right?
>
> A.     It does fade over time a little bit, yes, for sure.
>
> Q.      Okay. And that was also true for green coffee, correct?
>
> A.      Correct.
>
> Q.     Okay. And it was more than just a little bit, right? If you're going to be honest, it is more than just a little bit, right?

A.     Yes.

(7/17/20 at 400:17 – 401:15.)

The result of more supply and less demand naturally caused sales to decrease across the board as shown by Vitamins Online's own sales calculations.  (Demonstrative Trial Exs. 578-579; 5110.009-10.)  *This is why both Vitamins Online's sales and NatureWise's sales decreased as third-party competitors entered the market.*  Thus, Vitamins Online's falling sales were not attributable to any conduct of NatureWise, but rather, to the over-abundance of market supply of

Green Coffee and Garcinia Cambogia supplements. *This is why Vitamins Online's sales did not rise even as NatureWise's sales fell.* In the 30 months between the first quarter of 2014 and the second quarter of 2016, NatureWise's sales dropped precipitously, yet Vitamins Online's sales remained negligible likely because there were numerous third-party competitors. Vitamins Online's sales dropped because of the Oz Effect, not because of any alleged false advertising by NatureWise.

F.    **Intervening Factor #2: <u>Pricing</u>**

The second factor for the decline in Vitamins Online's sales is pricing. Given that Vitamins Online has admitted that there are "hundreds" of competitors in the market, common sense would dictate and the evidence confirmed that consumers purchased supplements based mainly on pricing.   In a crowded market, price was the driving force of sales.

Vitamins Online priced its products higher than competitors because it considered NutriGold products to be premium products with more expensive ingredients. Mr. Khan testified:

> Q. Now is it more expensive to buy the patented Garcinia or the Super CitriMax than to buy generic Garcinia?
>
> A. It is almost four or five times more expensive.

(7/16/20 Trial Tr. at 119:4-6.) Likewise, Mr. Khan testified that Vitamins Online's Svetol Green Coffee products were far more expensive because of the cost of Svetol:

> A. Svetol is almost $255 a kilo, and the generic green coffee bean extracts are somewhere about 50 or $60 a kilo. So about four or five times more expensive.

(7/16/20 Trial Tr. at 143:2-4.) Mr. Khan went on to explain:

> A. …We are the only ones who were making a 400 milligram full dosage Svetol product and despite being so *expensive*… (7/16/20 Trial Tr. at 146:10-12 (emphasis added));

22

> A. …The only product with 400 milligram of clinically Svetol. The reason we say "only" is really there was nobody else selling at that potency that product. It was so much more expensive, when it's *four or five times more expensive* people don't want to go for that… (*id*. at 148:12-17 (emphasis added)).

This is why Vitamins Online sales fell when cheaper alternatives flooded the market as a result of the Oz Effect.  This is why, over the years, various competitors (other than NatureWise) climbed to the top of the dietary supplements market by offering lower prices, including Vitamins Online itself:

Mr. Khan testified that the price of NatureWise's products were "a fraction" of Vitamins Online's products:

> A.    …I pretended to be a [NatureWise] customer interested in buying their products and they were quoting me $2 a bottle and $2.20 a bottle for purchasing that product. And I was shocked at their prices. Because as a manufacturer, I know how much it cost to make a product, a green coffee bean product. That was a fraction of our cost.

(7/17/20 Trial Tr. at 205:15-21.)  The bottom line is that Vitamins Online's sales fell, not because of competition from just NatureWise, but because of competition from hundreds of competitors offering cheaper products.

The price of Vitamins Online's Green Coffee supplements was consistently and significantly higher than that of almost every competitor and at times it was the highest in the market.

> Q.    So you have a list price of $64 a bottle. Is that correct?
>
> A.    Correct.
>
> Q.    And so -- but you never sell at the list price, right?
>
> A.    That is the price that we should have sold it at if we were trying to make a good margin on the product. **Because our ingredient we were paying almost five times the generic green coffee bean extract. But when everybody, including the generic sellers,**

23

> **started to sell their products so cheap, $15, $20 a bottle, you can
> only command a certain amount of premium.** So we could not
> have sold at $60 a bottle. **People typically will not pay that much
> for a month's weight loss.** So we sold it at a reasonable amount that
> we could actually still make things work for us. And so the list price
> was 64 and I believe the vast majority of the time we sold for $28 or
> $29.
>
> Q.     Okay. And so you never sold your green coffee product at $64 a
>        bottle, correct?
>
> A.     I won't say we never sold, there might have been instances when it
>        was completely not sold….

(7/17/20 Trial Tr. at 386:2-24 (emphasis added.)

Further Mr. Khan admitted that he would not adjust his prices:

> A.     We were using a really expensive material. If we start dropping our
>        prices more we would lose money, we would not be able to actually
>        stay in business….

(7/17/20 Trial Tr. at 398:2-4; see also Trial Exs. 65, 137, 158, 5146, 5147.)

Thus, Vitamins Online's elevated prices caused it to lose sales because customers could purchase readily available cheaper supplements from its competitors.  This is why none of Vitamins Online's experts performed any analysis of the effect of pricing on Vitamins Online's claim that it suffered injury from the accused advertising.

**G.     Intervening Factor #3: <u>Poor Ratings</u>**

Another reason that Vitamins Online's sales fell is because of its own bad rating.  Mr. Khan spent two days testifying about how great Vitamins Online's products were, how it invested in buying the best ingredients to offer the best products, yet Vitamins Online's own 2.9 average rating—based on tens of thousands reviews over the course of several years—fundamentally contradicts his testimony.

Mr. Khan testified:

Q.      (By Mr. Trojan) Okay. So we're going to look at **Exhibit 374**. Now, so this is your Garcinia-Cambogia product, correct?

A.      Correct.

Q.      And if we could scan down. And this is your customer review page, is that correct, on Amazon?

A.      Correct.

Q.      And it has **2.9 out of 5 stars.** Is that right?

A.      **Correct.**

Q.      And the highlighted portion says it does -- "It did not curb my appetite at all." Do you see that?

A.      Correct.

Q.      And then if we scan down a little bit farther, and if you could enlarge that, then you have a review that says, "No results." And with a heading of "No results" and then one below that, "Do not waste your money, did not work."

        **So don't these negative reviews damage your reputation with respect to your products?**

A.      Any given weight loss product is going to have some positives, some negative reviews. None of these are magical products that can guarantee produced weight loss results. They do require some work. These can only help as we have seen from the clinical studies even the placeboes lose weight. So some of these, yes, I would say is actually a function that you can pretty much expect on any given product even if you make the world's greatest product some people are going to complain. So in isolation, some of these don't necessarily damage your reputation. **But if they increase in a significant manner, then I would say yes, they would damage your reputation.**

(7/17/20 Trial Tr. at 393:15 – 394:21 (emphasis added).)  Interestingly, Vitamins Online's *average*

of 2.9 stars (out of five) never improved despite years of accumulating reviews.

Vitamins Online's mediocre reviews matter because its expert, Dr. Belch, opined that 87.9 percent of Amazon shoppers "Most of the Time" or "Always" rely on products reviews provided on Amazon.com, and 81.3 percent of Amazon shoppers find these reviews "Very Important" or "Extremely Important." (Demonstrative Trial Exhibit 551; 7/27/20 Trial Tr. 1291:21 – 1292:12.) Of particular relevance, Dr. Belch found that 72.2% of respondents reported that *negative* reviews are very or extremely influential on purchase decision. (*Id.*) It is not wonder, then, that Vitamins Online's experts did not analyze the effect of its own low rating on its sales just as they did not analyze the effect of its high pricing on its sales.

Consumers had no reason to pay premium prices for NutriGold products that had thousands and thousands of mediocre reviews. If Vitamins Online was injured at all, its injuries were self-inflicted as reflected in the poor reviews of its products.

**H.      No Evidence of Nexus**

**1.      No Consumer Testimony Evidence to Establish a Nexus**

Vitamins Online did not present any evidence to show that consumers who had purchased its supplements switched to NatureWise's supplements because of the accused advertising. Though Vitamins Online's products and NatureWise's products have been on the market for years, generating *tens of thousands* of Amazon reviews (Trial Exhibit No. 557, 558, 559, 560), Vitamins Online did not identify reviews showing that consumers purchased NatureWise's supplements instead of Vitamins Online's supplements because of the accused advertising.

**2.      No Survey Evidence for the Ingredient Claims**

Vitamins Online did not conduct a survey to establish that consumers purchased NatureWise's supplements instead of Vitamins Online's supplements because of the 39 specific

alleged Ingredient claims.[14]  Vitamins Online's failure to provide a consumer survey showing that it was injured by the Ingredient claims warrants a presumption that such a survey would have been unfavorable.  *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1054 (C.D. Cal. 2013) ("the Court does note that Plaintiff failed to provide a consumer survey showing a likelihood of confusion; failure to do so warrants a presumption that the results would have been unfavorable" (internal quotations and citation omitted)).[15]

### 3.    Dr. Belch's Testimony on the Review Survey

For the Review claims, Vitamins Online offered a survey conducted by Dr. Belch.  The survey confirmed the unremarkable observation that reviews, in general, matter to Amazon consumers.  No one disputes the materiality of reviews to Amazon consumers.  But what the survey failed to show is how the specific Review claims at issue in this case caused consumers to purchase NatureWise's products instead of Vitamins Online's products:

> Q.    And so there's nothing in your survey that indicated whether consumers would switch from a NatureWise product to a Vitamins Online product; correct? You never asked that question; right?
>
> A.    That would be a different survey.

(7/27/20 Trial Tr. at 1344:2-25; *see also*, 1371:12-18.)

---

[14] Vitamins Online did not conduct a survey even though the Court had extended expert discovery to permit Vitamins Online to conduct such surveys. 2016 WL 538458, at *10.

[15] *See also*, *Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 55 F.Supp.2d 1070, 1084 (C.D.Cal.1999), aff'd, 202 F.3d 278 (9th Cir. 1999) ("[Plaintifff] also failed to provide a survey showing a likelihood of confusion. This warrants a presumption that the results would have been unfavorable."); *James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.*, Case No. CV 11-1309 DOC (ANx), 2013 WL 655314, at *9 (C.D. Cal. Feb. 21, 2013) ("plaintiff's failure to conduct a consumer survey, assuming it has the financial resources to do so, may lead to an inference that the results of such a survey would be unfavorable"); *Network Automation, Inc. v. Hewlett-Packard Co.*, Case No. CV 08-4675 JFW (Rzx), 2009 WL 5908719, at *10 (C.D. Cal. Sept. 14, 2009) (the "lack of survey evidence counts against finding actual confusion").

In fact, Dr. Belch's survey did not even ask questions about the specific Review claims at issue.  (7/27/20 Trial Tr. at 1364:6-18.)   It only purported to survey, at a very high level, consumers' "perception" of reviews, without determining precisely how the reviews impact purchasing decisions as to the products at issue.  (*Id*. at 1341:21 – 1342:15.)  Further, Dr. Belch himself admitted that reviews are but one factor among many different factors (*e.g.* pricing, product marketing, customer service) that consumers consider in buying a product.  (*Id*. at 1342:10-13; 1344:1-12; 1364:19 – 1366:21.)  Just determining that reviews are one "important" factor among many other factors does not shed any light on whether the Review claims in this case caused consumers to buy NatureWise's products. (*Id*. at 1344:13-25.)   For instance, Dr. Belch's survey did not and cannot eliminate the possibility that consumers purchased NatureWise's products because they were cheaper than many other products:

> Q.    And you never -- you never asked the people in the survey what if any of the factors that you described would cause them to switch from Vitamins Online to NatureWise; correct?
>
> A.    Not specifically. But I asked them how important these factors were in their purchase decision. And clearly if I were to switch from one brand to another brand it would be the result of certain factors which led to that.
>
> Q.    But you only surveyed one factor, which was the reviews; correct?
>
> A.    That's correct.
>
> Q.    But the decision is never just limited to – the purchasing decision is never limited to just what the reviews say; correct?
>
> A.    That's right. I'm looking at these reviews as input into the purchase decision process.

(*Id*. at 1345:1-16.)

Further, Dr. Belch also did not determine *how many* reviews a typical consumer would look at before making a purchasing decision, whether the consumer might look at one, two, three

or more pages of reviews.  (7/27/20 Trial Tr. at 1366:10-13.)  He did not explain *what* the typical

consumer might look for in reading reviews.  (*Id*.)  Further still, Dr. Belch testified that there was

nothing wrong with giving away free products.  (*Id*. at 1355:25 – 1356: 1356:6; *see also*, 1346:13

– 1347:14; 1356:15 – 1357:6.)

Most critically, Dr. Belch's survey did not address the issue of causation of injury.  His

survey did not ask whether consumers would switch from Vitamins Online's products to

NatureWise's products because of the Review claims.:

> Q.     There's nothing in the survey that would inform us as to what would be
> required for a Vitamins Online customer to switch to be a NatureWise
> customer; right?
>
> A.     No, there's nothing in it.

(7/27/20 Trial Tr. at 1369:24 – 1370:2; *see also*, 1371:12-18.)   Where the survey was relevant at

all, it showed that only **0.9%** of respondents indicated they "would not trust product or

manufacturer" if they "knew that the customers who wrote the reviews received the weight loss

product from the manufacturer for free prior to writing the reviews but did not disclose this

information."  (Demonstrative Trial Ex. 544.11; *see also*, 7/27/20 Trial Tr. at 1374:1-20.)

As Vitamins Online failed to establish injury, the Court should grant judgment against

Vitamins Online on its Review claims.

**V.     NO EVIDENCE TO SUPPORT A PERMANENT INJUNCTION**

The Court should also grant judgment against Vitamins Online's permanent injunction

claim because Vitamins Online has not shown that it is entitled to such relief based on either the

Ingredient claims or the Review claims.  The Supreme Court teaches:

> According to well-established principles of equity, a plaintiff
> seeking a permanent injunction must satisfy a four-factor test before
> a court may grant such relief. A plaintiff must demonstrate: (1) that

> it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837, 1839, 164 L. Ed. 2d 641 (2006).

### A.     No Injunction for the Ingredient Claims

In previously denying Vitamins Online's request for an injunction, this Court stated:

> The *court declines to apply a presumption of irreparable injury to obvious competitors for purposes of injunctive relief* under the Lanham Act. After *eBay*, the validity of any presumption of irreparable injury for purposes of an injunction is questionable, and, in particular, the presumption for obvious competitors is problematic because of the small amount of legal support for it.

*Vitamins Online, Inc. v. Heartwise, Inc.*, 2016 WL 538458, at *9.  For the reasons as discussed above, Vitamins Online is not entitled to an injunction because it has no evidence of irreparable injury.

To the extent that any specific individual Ingredient claim did not past testing in 2013, those problems have since been the fixed.   When NatureWise realized that PLN was not making products that consistently passed testing, NatureWise eventually switched manufacturers to Robinson Pharma (for its Garcinia Cambogia products) and ANS (for its Green Coffee products) and implemented standard operating procedures to make sure that products passed testing before going out the door.  (7/23/20 Trial Tr. *passim*.)  Since the change to Robinson Pharma in 2014, NatureWise's products have met their labeling claims.   The present Ingredient claims are thus accurate and true.

Thus, Vitamins Online has not and cannot show that it is suffering irreparable harm by any of the *current* Ingredient claims and there is no basis to presume injury based on the Ingredient claims from 2013. *See, e.g.*, *Buhl v. Davis*, No. 14-CV-00302-REB-CBS, 2016 WL 890034, at *3 (D. Colo. Jan. 26, 2016), report and recommendation adopted, No. 14-CV-00302-REB-CBS, 2016 WL 879633 (D. Colo. Mar. 8, 2016) ("Mr. Buhl's request for prospective injunctive relief is now moot in light his corrective surgeries in 2015. The injunctive relief that Mr. Buhl originally sought with the Amended Complaint will not remedy past harms that Mr. Buhl attributes to the individual Defendants and will have no effect on his current eyesight."); *Rachel v. Troutt*, No. CIV-15-141-R, 2017 WL 1440007, at *5 (W.D. Okla. Feb. 10, 2017), report and recommendation adopted sub nom. *Rachel v. Troutt*, No. CIV-15-141-R, 2017 WL 1437890 (W.D. Okla. Apr. 21, 2017) ("…granting Plaintiff's motion for injunctive relief *would have no effect in the real world*, nor would it affect the behavior of the Defendants toward the Plaintiff." (emphasis added)). Therefore, there is no basis for an injunction as to the Ingredient claims.

### B.    No Injunction for the Review Claims

There is also no basis for an injunction as to the Review claims for the same reasons.

Vitamins Online did not present evidence of irreparable harm as a result of the Review claims as discussed above.

Indeed, there is no prospect of harm because NatureWise stopped voting on the helpfulness of reviews since about 2015 after the change in Amazon's policies and Vitamins Online has no proof that NatureWise still provides free bottles to customers on Amazon.  (Trial Ex. 5008.)

Regardless, the Review claims do not violate the Lanham Act.  For instance, Vitamins Online contends that NatureWise had its employees voted on the helpfulness of reviews,[16] but voting on the helpfulness of reviews did not violate the Lanham Act because it did not alter the substance of any actual reviews by consumers.  It only boosted the visibility of the reviews.

Giving away free product samples to incentivize positive reviews also did not violate the Lanham Act because real consumers were writing real reviews, and they were free to write whatever they wanted because the complementary products were not contingent on the reviews. Vitamins Online's own expert, Mr. Noonan, testified that incentivizing reviews does not mean that the reviews are false.  (7/28/20 Trial Tr. *passim*.)  Mr. Belch testified that giving free product samples to encourage positive reviews is a typical marketing practice.

Therefore, no injunction as to the Review claims is warranted.

## VI.    JUDGMENT ON THE UNFAIR COMPETITION CLAIM

The Court should also grant judgment against Vitamins Online on its unfair competition claim under Utah common law.

The Tenth Circuit teaches that under Utah common law, unfair competition covers only passing-off or misappropriation claims: "[u]nfair competition has developed generally into two branches: 1) passing-off or palming-off claims; and 2) misappropriation claims."  *Proctor & Gamble Co. v. Haugen*, 947 F. Supp. 1551, 1554 (D. Utah 1996).

Vitamins Online did not allege in the Complaint or in the Pretrial Order that NatureWise is "palming off" or otherwise "misappropriating" Vitamins Online's goodwill from its products. This Court has already concluded "this case does not involve comparative advertising." *Vitamins*

---

[16] Mr. Doyle explained that NatureWise's employees sometimes voted on the helpfulness of reviews to counter attacks by competitors who voted down positive reviews of NatureWise's products.  (7/20/20 Trial Tr. at 537:14-23; 554:16-2.)

*Online, Inc. v. HeartWise, Inc.*, 2019 WL 6682313, at *13. Vitamins Online did not argue at trial that NatureWise is "palming off" or otherwise "misappropriating" its goodwill.

Therefore, judgment on the Vitamins Online on its unfair competition claim is appropriate.

## VII.   CONCLUSION

Therefore, the Court should grant judgment pursuant to Rule 52(c).


Respectfully submitted,

**TROJAN LAW OFFICES**
**BY**


/s/ R. Joseph Trojan
R. Joseph Trojan
Dylan C. Dang
Francis Wong
Kevin Davis
*Attorneys for HeartWise, Inc., dba NatureWise*