## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| VITAMINS ONLINE, INC., a Delaware corporation, | |
| **Plaintiff,** | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| **v.** | |
| HEARTWISE, INC. an Oregon corporation d/b/a NATUREWISE, | **Case No.:  2:13-cv-00982-DAK** |
| **Defendant.** | **Judge Dale A. Kimball** |

On October 28, 2013, Plaintiff filed a complaint against Defendant in this court alleging unfair competition under Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) and Utah common law for false advertising.  The Complaint alleged false advertising based on two types of conduct: (1) manipulating Amazon.com's ("Amazon") customer review system ("Review Claims"); and (2) falsely advertising and misrepresenting the content and characteristics of its green coffee and garcinia cambogia products ("Ingredients Claims").

The court held a bench trial in this matter on July 16 – August 6, 2020.  Plaintiff was represented by James E. Magleby, Yevgen Kovalov, Edgar R. Cataxinos, and Geoffrey Kris Biehn.  Defendant was represented by R. Joseph Trojan, Francis Wong, Kevin R. Davis, and Dylan C. Dang.  Throughout the trial, the court heard the testimony of witnesses and received exhibits by the parties into evidence.  At the close of Plaintiff's case in chief, Defendant moved for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c).

The court now issues the following Findings of Fact and Conclusions of Law, finding that Plaintiff has met its burden in demonstrating that Defendant violated Section 43(a) of the

Lanham Act and Utah state common law.  In conjunction thereto, the court denies Defendant's Rule 52(c) motion.

## FINDINGS OF FACTS[1]

1.      Vitamins Online, Inc. ("Vitamins Online") is a Utah-based retailer that distributes supplements under the brand name NutriGold.  Tr. 66-67 (Khan).  Osman Khan ("Khan") and Sripriya Rangarajan ("Rangarajan") are the co-founders of Vitamins Online and NutriGold.  Tr. 70.  Khan is the Chief Financial Officer of Vitamins Online.  Stip. Fact 3. Vitamins Online launched its brand of supplements under the NutriGold brand in 2010.  Tr. 70.  Prior to that time, Khan and Rangarajan invested considerable time and resources to identify options to make products without the excipients (e.g. magnesium stearate, silicon dioxide) commonly found in dietary supplements.  Tr. 70.  It took Vitamins Online approximately one year of preparation and an additional year to launch its first NutriGold product.  Tr. 70.  Khan testified at trial, and the court finds that he was a credible, reliable witness.

2.      HeartWise, Inc d/b/a NatureWise ("NatureWise") is an Oregon Corporation that sells dietary supplements on Amazon under the brand name NatureWise.  NatureWise was

---

[1] The court enters these findings of fact based on a preponderance of the evidence.  In assessing the credibility of the witnesses, the court has considered the source and basis of each witness's knowledge; the ability of each witness to observe; the strength of each witness's memory; each witness's interest, if any, in the outcome of the litigation; the relationship of each witness to either side in the case; and the extent to which each witness's testimony is either supported or contradicted by other evidence presented at trial.

In addition, the court will provide citations to the record in the following manner: references to the uncontroverted facts submitted by the parties and adopted by the court in its July 7, 2020 Pretrial Order (ECF No. 535) are abbreviated as "Stip. Fact [X]"; references to the hearing transcript are abbreviated as "Tr. [page]"; and references to exhibits admitted at trial are abbreviated as "Ex. [X]."  In addition, although, in the Pretrial Order, Plaintiff does not set forth any uncontroverted facts and contests virtually every fact set out by Defendant, Plaintiff acknowledges that it does not contest "simple facts relating to the entities and the role by the principals of each entity."  (*Id.*)  Accordingly, the court's citation to the Pretrial Order will be limited to these "simple facts."

incorporated in May of 2012.  Tr. 419-420; Ex. 5144.001.  DavidPaul Doyle ("Doyle") is

NatureWise's founder and Chief Brand Officer.  Stip. Facts 4-6.  In 2018, Tom Nguyen of

Robinson Pharma became NatureWise's Chief Executive Officer following his investment in the

company.  Tr. 423-424.  Doyle currently owns 49% of NatureWise and has no active role in its

management or daily operations.  Tr. 424.  Doyle testified at trial.  The court finds that he was

not a credible witness, and his testimony was unreliable.[2]

I.      **Ingredients Claims**

A.      **NutriGold's Garcinia Cambogia Gold**

3.      Vitamins Online first launched its NutriGold Garcinia Cambogia Gold

supplement ("NutriGold Garcinia") in 2011.  Tr. 106.  Garcinia cambogia is a fruit that contains

hydroxycitric acid ("HCA").  Tr. 106.  NutriGold Garcinia contained the clinically proven,

multi-patented SuperCitrimax garcinia cambogia ingredient supplied by the company InterHealth

(now Lonza).  Tr. 107-108; Tr. 114-115; Ex. 3.  SuperCitrimax is a patented form of HCA from

garcinia cambogia bound to calcium and potassium.  Tr. 114-115; Ex. 3.  SuperCitrimax

provides 60% calcium/potassium salt HCA and is clinically proven to curb appetite, burn fat, and

reduce body weight.  Tr. 114-115; Ex. 3.  Generic garcinia cambogia does not have the same

clinical support as SuperCitrimax because the generic is not bound to the patented ratio of the

calcium/potassium salt.  Tr. 117.  SuperCitrimax is significantly more expensive than generic

extracts because it is proven to be effective and provides a competitive advantage in the

marketplace.  Tr. 119.

---

[2] The issues surrounding Doyle's credibility are demonstrated and detailed through the
findings below.

4.      Prior to the middle of 2013, there were a few other competitors on Amazon that were offering garcinia cambogia products, and some contained SuperCitrimax.  Tr. 123-24. However, by mid-2013, Vitamins Online was the only seller of SuperCitrimax garcinia cambogia on Amazon.  Tr. 123-24.  Vitamins Online advertised its NutriGold Garcinia product on Amazon as containing SuperCitrimax and 60% HCA.  Tr. 110-19; Tr. 114-15; Ex. 3.  Vitamins Online heavily advertised that its product contained SuperCitrimax because it was backed by clinical studies.  Tr. 119.

5.      The TV personality Dr. Mehmet Oz, known as "Dr. Oz," aired a television show on October 1, 2012, in which he promoted the benefits of garcinia cambogia.  Ex. 55, 104.  That show featured Dr. Harry Preuss, the chief researcher for the SuperCitrimax ingredient in several studies.  Tr. 207-10; Exs. 104, 105, and 56.  In the episode, Dr. Oz gave specific buying guidelines to help customers purchase the right product—garcinia cambogia extract with at least 50% HCA and potassium or calcium/potassium.  Tr. 211; Ex. 56.1.  He also emphasized that the dosage needed to be high.  Tr. 211; Ex. 56.1.  Dr. Oz's show on garcinia cambogia increased Vitamins Online's sales substantially.  Tr. 212-13.  In order to meet that demand, NutriGold had a supply agreement with InterHealth that guaranteed an uninterrupted supply of SuperCitrimax. Tr. 216-17; Ex. 607.

6.      Vitamins Online spent millions advertising its NutriGold Garcinia and placed particular emphasis on the SuperCitrimax ingredient.  Tr. 152-57; Ex. 611.1.

B.      NutriGold's Svetol Green Coffee Gold

7.      In 2012, Vitamins Online launched a green coffee product with Svetol ("NutriGold Green Coffee") (collectively, with NutriGold Garcinia, the "NutriGold Products"), a chlorogenic acid product produced by the company Naturex.  Tr. 137.  Svetol is approximately four or five times more expensive than generic green coffee bean extract.  Tr. 142-43, 145.

4

Despite its higher price, Vitamins Online chose to produce a green coffee product containing Svetol because it was backed by clinical studies. Tr. 137-39. The studies relied upon by Vitamins Online demonstrated that the amount of the active ingredient of the green coffee is critical, as a product with less than the amount used in the study may not provide the same benefit. Tr. 141-42; Ex. 634.3. Importantly, Svetol was the only green coffee extract that was clinically proven to provide a weight-loss benefit. Tr. 143-44. Therefore, on its Amazon product page, Vitamins Online advertised NutriGold Green Coffee as the only product that contained 400 milligrams, the dosage used in the clinical studies, of Svetol Green Coffee extract per capsule. Tr. 146; Ex. 380.2. Vitamins Online spent millions advertising its NutriGold Green Coffee and placed particular emphasis on the Svetol ingredient. Tr. 152-57; Ex. 611.1.

8. Dr. Oz aired a television show on March 1, 2012 promoting the benefits of green coffee. Tr. 157; Ex. 5. Sales of Vitamins Online's NutriGold Green Coffee spiked after the episode. Tr. 159. In late 2012, Dr. Oz aired a second episode on green coffee, offering buying guidelines for green coffee bean extract products. Tr. 199, 872; Exs. 41-42. In the second show, Dr. Oz told viewers to look for Svetol or GCA; products that had at least 45% chlorogenic acid; products dosages of 400 mg, 3x per day; and explained that a 30-day supply costs approximately $30. Tr. 201-03, 206-07, 873; Exs. 42.1, 42.2. He also warned consumers to not be duped by the word "pure." Tr. 201-03, 206-07, 873; Exs. 42.1, 42.2. In addition, Dr. Oz recommended purchasing products with no fillers and no artificial ingredients. Tr. 996; Ex. 56.

9. Following the second Dr. Oz show, sales of NutriGold Green Coffee increased significantly because the product matched Dr. Oz's requirements. Tr. 206. Eventually, NutriGold Green Coffee obtained a #1 ranking on the Amazon Best Sellers list. Tr. 160-61.

### C.    NatureWise's Products

10.    When Doyle launched NatureWise, he had no experience with supplements or the supplement industry.  Tr. 425.  He did, however, have experience in selling spiritual books on Amazon.  Tr. 418-19.  To transition from book sales to supplements on Amazon, Doyle watched a few videos on the internet and looked for a supplier.  Tr. 430.  In addition, he conducted research and discovered green coffee bean extract was the top seller in the health and personal care category on Amazon.  Tr. 425.  Accordingly, NatureWise's first product was a green coffee product.  Tr. 427.

11.     From approximately 2012 to the end of 2013, NatureWise launched six products–Green Coffee Bean Extract 800; Svetol with GCA; Garcinia Cambogia; Krill Oil; Ubiquinol; and Vitamin D.  Tr. 427-28.

12.    NatureWise launched the following products on the following dates: the first green coffee product (Amazon Standard Identification Number ("ASIN") B009VUZJTM) launched in July of 2012; the second green coffee product launched in October 2012 (ASIN B009aH4OR4); the first garcinia product launched in January 2013 (ASIN B00B5H5BHA); the second garcinia product launched in August 2015 (ASIN B01HRHBNJK).  Tr. 429; Ex. 701.1.

### 1.    NatureWise's Green Coffee

13.    NatureWise launched its first green coffee product in the summer of 2012 as a result of high consumer demand.  Tr. 420, 433.  That product was called NatureWise Green Coffee Bean Extract 800 (the "First Green Coffee").  Tr. 427.  NatureWise used Private Label Nutraceuticals ("PLN") as its contract manufacturer.  Tr. 859-61; Ex. 50.20.  NatureWise's first purchase from PLN occurred in June 2012, and NatureWise continued purchasing product from PLN thereafter.  Tr. 859-63; Ex. 50.20-30.  At the start, NatureWise purchased generic green coffee from PLN and merely asked PLN to include higher quality ingredients without giving

specifications.  Tr. 857.  Furthermore, in its purchase orders, NatureWise did not specify any percentage of chlorogenic acid that the end product should contain.  Tr. 859-863; Ex. 50.21-30.  Similarly, NatureWise's label for the First Green Coffee did not specify the percentage of chlorogenic acid that it contained.  Tr. 863; Exs. 5025.17-18, 5024.15.

14.     Nevertheless, NatureWise advertised the First Green Coffee as containing 50% chlorogenic acid on Amazon.  Tr. 862-64; Ex. 102.1.  Likewise, NatureWise advertised it as having optimum levels of chlorogenic acid.  Tr. 867-68; Ex. 1021.1.  But NatureWise did not test the First Green Coffee to determine the actual percentage of chlorogenic acid that it contained.  Tr. 872.  NatureWise did not begin performing such tests until March 2013, at the earliest.  Tr. 889; 5144.1.

15.     NatureWise also referenced a 2012 study involving Green Coffee Antioxidants ("GCA") to sell the First Green Coffee even though that product did not contain GCA.  Tr. 871; Ex. 1021.1.  NatureWise understood that the study was conducted using a dosage of at least 350 milligrams of GCA twice a day.  Tr. 893.  In referencing the study, NatureWise advertised that the First Green Coffee contained "Clinically Proven GCA" on the front of the bottle.  Tr. 891-92; Ex. 22.

16.     In the fall of 2012, following the second Dr. Oz episode on green coffee, NatureWise changed the title of the First Green Coffee to Green Coffee Bean Extract 800 with GCA.  Tr. 875-76; Ex. 5025.1-4.  NatureWise continued representing that it contained 50% chlorogenic acid on Amazon and that its ingredients corresponded with the GCA study.  Tr. 882-83; Ex. 1021.1.  However, the product only contained approximately 5 milligrams of GCA.  Tr. 877-78; Ex. 50.2.  Doyle knew that the product contained a minimal amount of GCA—an amount that failed to match the dosage used in the GCA study.  Tr. 878.

17.     Reviewers on Amazon believed that the First Green Coffee contained the proper amounts of GCA and relied on NatureWise's representations.  Tr. 971; Exs. 572A.1, 572A.2.

18.     At some point in late 2012, Amazon removed the phrase "chlorogenic acid" from the First Green Coffee's product page because it wanted proof that the claim was accurate.  Tr. 883.  After Amazon removed the phrase, Doyle informed Amazon that it had 50% chlorogenic acid.  Tr. 884-85; Ex. 86.  Yet, in a November 2012 email to PLN, Doyle admitted that he did not know how many milligrams of green coffee were in the First Green Coffee.  Tr. 880-81; Harden Dep. 53-57; Ex. 669.51-669.55.  Because he could not verify the amount of chlorogenic acid in the First Green Coffee, Doyle asked Amazon to change the listing name to "Green Coffee Bean Extract 800 – 100% Pure All Natural Weight Loss Supplement for All Body Types.  Chlorogenic Acid.  800mg.  60 Caps."  Tr. 887; 86.1.

19.     Because NatureWise was not conducting tests on the First Green Coffee until March 2013, at the earliest, NatureWise did not know how much chlorogenic acid it contained.  Tr. 889-90; Ex. 5144.1.

20.     Around January 2013, NatureWise purportedly increased the amount of GCA in the First Green Coffee to 20 milligrams—an amount still well below the amount used in the GCA study that NatureWise referenced on Amazon.  Tr. 895; Ex. 50.13.  Yet, NatureWise advertised that the First Green Coffee contained clinically proven GCA on its labels.  Tr. 891-92; Ex. 8.1, 22.1.

21.     In March 2013, Doyle began testing his products.  Tr. 951; Ex. 124.  The test results indicated that some lots of NatureWise's First Green Coffee did not match their label claims.  Tr. 947, 951; Exs. 123.1, 124.  However, NatureWise continued selling the First Green Coffee and did not recall any lots.  Tr. 950; Ex. 123.1.

22.     Eventually, NatureWise purportedly increased the amount of GCA in the First Green Coffee to 350 milligrams—the same dosage as used in the GCA study.  Tr. 904. However, around that time, Doyle learned that the GCA study was seriously flawed.  Tr. 984-86, 993; Ex. 341.  But NatureWise continued advertising the First Green Coffee as being clinically proven. Tr. 906.  The study was officially retracted in October 2014.  Tr. 990; Ex. 1001.1.

23.     Along with the First Green Coffee, in October 2012, NatureWise started advertising a second green coffee product called Svetol Green Coffee Bean Extract UltraPure with GCA (the "Second Green Coffee" and, collectively with the First Green Coffee, the "Green Coffees").  Tr. 909; Ex. 701.1.  The Second Green Coffee contained 300 milligrams of a proprietary blend of generic green coffee extract and GCA and 133 milligrams of Svetol.  Tr. 912; Ex. 57.4.  NatureWise advertised Svetol and GCA prominently on its bottle and packaging. Tr. 913; Exs. 24.1, 25.1.

24.     In March 2013, Doyle learned from Naturex that the Second Green Coffee did not meet its label claims.  Tr. 919, 930-31; Ex. 115.1.  Naturex explained that it had tested samples provided by NatureWise, and those samples contained much less chlorogenic acid than was advertised on the label.  Ex. 115.1.  Consequently, Naturex demanded that NatureWise recall all of the non-conforming units.  Tr. 931; Ex. 115.2.  In addition, Naturex demanded that NatureWise notify customers who had purchased non-conforming units that the product they purchased did not meet its label claims.  Tr. 931; Ex. 115.2.  Although NatureWise had the capability of doing so, Doyle does not remember ever contacting customers as requested by Naturex.  Tr. 933-34.

25.     Notwithstanding Naturex's request to recall the Second Green Coffee units that did not match their label claims, NatureWise continued selling them.  Tr. 944, 955, 961; Ex.

9

131.1.  Further, NatureWise intentionally sold as many bottles as it could before the deadline that Naturex had imposed to recall the non-conforming product.  Tr. 944, 955, 961; Ex. 131.1. NatureWise only ceased selling the non-conforming Second Green Coffee because Doyle was worried about getting in trouble with Naturex for selling beyond the deadline.  Tr. 956-57; Ex. 131.2.

26.     On June 28, 2013, Naturex informed NatureWise once again that the Second Green Coffee still did not conform to its label claim.  Tr. 964-65; Exhibit 1016.  Specifically, NatureWise advertised the Second Green Coffee as being vegetarian, but Naturex determined that claim was not true.  Tr. 964-65; Exhibit 1016.  As a result, Naturex terminated its licensing agreement with NatureWise in June 2013.  Tr. 965-67, 969-70.

## 2.     NatureWise's Garcinia Cambogia

27.     NatureWise launched its first garcinia cambogia product (the "First Garcinia") in January 2013.  Tr. 429; Ex. 701.1.  It began shipping the First Garcinia by at least June 2013.  Tr. 254-55, 1004; Ex. 108.1.  The First Garcinia used generic garcinia cambogia ingredients.  Tr. 1001.  It did not have SuperCitrimax.  Tr. 1000-01.

28.     When launching the First Garcinia, Doyle was keenly aware of NutriGold.  Tr. 1010.  Doyle relied on NutriGold Garcinia's product information on Amazon to develop the claims for the First Garcinia.  Tr. 1010-11; Ex. 106.  Doyle wanted to sell SuperCitrimax because NutriGold was selling it.  Tr. 1015; Ex. 95.

29.     Although the First Garcinia did not contain SuperCitrimax, NatureWise referenced SuperCitrimax on its Amazon product page and included the SuperCitrimax logo on the First Garcinia's label.  Tr. 1004-05; Ex. 108.  NatureWise further advertised the First Garcinia as being clinically proven and having a patented form of 60% HCA bound to calcium and potassium on the First Garcinia's label, box, and Amazon product page.  Tr. 1006-07, 1032,

1035-36; Exs. 108-108.1; 83-84, 375-76.  This was a direct reference to SuperCitrimax because such claims were patented by and proprietary to SuperCitrimax.  Tr. 114-15; Ex. 3.  NatureWise also advertised that the First Garcinia contained "100% Pure SuperCitrimax."  Tr. 1021, 1037; Ex. 83-84, 375-76.  NatureWise did this, and continued doing this for a period of time, even though it was not authorized by InterHealth to sell SuperCitrimax and even though Doyle knew that NatureWise was unable to obtain a licensing agreement for SuperCitrimax.  Tr. 1018, 1021; Ex. 375.  NatureWise eventually stopped advertising SuperCitrimax in the First Garcinia, but it is unclear when that advertising actually ceased.  Tr. 1016.

30.     The First Garcinia reached the number one spot on Amazon within two months after launch.  Tr. 1031; Ex. 146.  During that time, NatureWise sold 74,000 bottles of the First Garcinia and generated approximately $2 million in revenue.  Tr. 1031; Ex. 146.

31.     In December 2013, NatureWise hired a consultant, AIBMR, to review NatureWise's advertising claims on the First Garcinia.  Tr. 104.  After conducting its review, AIBMR determined and informed NatureWise that many of the claims it was making regarding the First Garcinia were neither legitimate nor substantiated.  Tr. 1046-47, 1054; Exs. 240, 356.  This was especially true with respect to the claims explicitly and implicitly referring to SuperCitrimax given that the First Garcinia did not contain SuperCitrimax, and therefore lacked its patented and proprietary elements.  Tr. 1046-47, 1054; Exs. 240, 356.  AIBMR recommended that NatureWise stop making weight-loss and appetite suppressant claims given that the First Garcinia was generic garcinia cambogia, and NatureWise was making claims unique to SuperCitrimax.  Tr. 1041; Ex. 356.

32.     Notwithstanding AIBMR's recommendation, NatureWise continued to make weight-loss and appetite suppressions claims.  Tr. 1044, 1050-51; Ex. 356.  AIBMR also

11

recommended that NatureWise remove references to various clinical studies because, after performing the necessary research, AIBMR was unable to locate such studies.  Tr. 1878-79, 1886; Ex. 245

33.     Notably, NatureWise did not sell a garcinia cambogia product with SuperCitrimax until it launched a second garcinia cambogia product in August 2015 (the "Second Garcinia," collectively with the First Garcinia, the "Garcinias").  Tr. 1093-94; Ex. 701.1.

**D.     Production and Manufacturing of the Green Coffees and the First Garcinia**

34.     As stated above, NatureWise used PLN as its first contract manufacturer.  Tr. 859-61; Ex. 50.20.  However, at some point in 2013, Doyle learned that PLN was not actually a contract manufacturer.  Tr. 957-58.  Instead, PLN was a mere intermediary that was purchasing products from actual contract manufacturers.  Tr. 956-60.  As such, for much of the time in 2012 and 2013, NatureWise did not know who was manufacturing the Green Coffees and the First Garcinia.  Tr. 1766.  Eventually, NatureWise learned that a contract manufacturer named Metaugus was producing its products.  Tr. 114; Ex. 511.  Notably, Metaugus received an FDA warning letter on May 22, 2013, for violating laws that regulate supplement production.  Tr. 114; Ex. 511.

35.     In October 2013, NatureWise stopped using PLN and began using DNE Nutraceuticals ("DNE") as its contract manufacturer.  Tr. 859-61, 981; Exs. 50.20, 298.1.  Like Metaugus, DNE received a warning letter from the FDA in August 2013 for reasons similar to Metaugus.  Tr. 1770; Ex. 512.

36.     Even though NatureWise was unaware for much of 2012 and 2013 as to who was actually manufacturing its products, NatureWise made the following claims regarding the Green Coffees and the First Garcinia:

(a)      That each ingredient that NatureWise used was verified for purity through in-house laboratory testing, Tr. 868-69, 2257; Exs. 386.2;1021.1;

(b)      That NatureWise had implemented a strict set of FDA compliant manufacturing procedures to ensure product integrity, including daily inspections of all storage, blending and production areas, Tr. 2258-59; Ex. 386.2; and

(c)      That NatureWise's facilities were regularly inspected by FDA officials to maintain their certifications, Tr. 2260-61; Ex. 386.2.

37.      Although NatureWise eventually figured out who was manufacturing its products, it failed to maintain necessary documentation demonstrating and detailing how the Green Coffees and the Garcinias were made (collectively, the "Products"). Tr. 1737, 1890, 1976. For example, NatureWise represented in July 2015 that, despite being in business and selling its products since 2012, it did not have Standard Operating Procedures ("SOPs") and that it was in the process of developing product specification sheets. Tr. 1131, 1774. Despite NatureWise's representation, it never produced any SOPs in this case. Tr. 1737.

38.      NatureWise also failed to track which label or labels it used for each lot/batch of the Products. Tr. 845-46; Ex. 401.6. Indeed, NatureWise did not maintain any specific data relating to specific labeling for specific lots of the Products. Tr. 1125-26; Ex. 408.3. Consequently, during discovery, NatureWise represented that it:

(a)      Could not identify the specific label or labels that it used on bottles for each lot/batch of the Products that it produced, Tr. 845-46; Ex. 401.6;

(b)      Lacked the ability to know which labels were used at which times, or which label revisions were used on final products, Tr. 847; Ex. 401.8-9.

(c)     Lacked the information as to the period during which products containing each lot/batch were sold, Tr. 847; Ex. 401.6-7; and

(d)     Could not identify which label claims were made on specific dates, Tr. 877.

39.     Nevertheless, immediately before trial, NatureWise produced some photographs of labels next to lot numbers.  Tr. 1127-28; Exs. 5025.1, 5024.-4; 5022.1-4.

### E.     NatureWise Product Testing

40.     Vitamins Online presented testimony from an expert in analytical supplement testing, Dr. Norman Howe, Ph.D. ("Dr. Howe").  The Court finds that Dr. Howe was qualified and credible and that his testimony was based on sufficient facts and data and the product of reliable scientific principles and methods.  Tr. 1733-34.  Mollie Kober ("Kober") testified at trial for the purpose of rebutting Dr. Howe's testimony.  While the court finds that Kober's testimony was credible, she failed to rebut Dr. Howe's testimony that certain lots of the Products did not meet their label claims.

41.     Dr. Howe compared test results against label claims because NatureWise never produced SOPs, and label claims were the best information available in the absence of such specifications.  Tr. 1866.

42.     A certificate of analysis ("COA") is a written document that includes finished product specifications, test method for each specification, the results of testing to verify that each specification has been met, and the signature of the analyst.  Tr. 1787.  Finished product specifications are extremely important in the dietary supplement industry.  Tr. 1774.

43.     For example, if a company claims that it has a "quality" product, it must first define what "quality" is for that product.  Tr. 1774.  The way that a company does that is through

a specification sheet.  Tr. 1774.  Specifications define product quality in clear, measurable terms.
Tr. 1801.

44.     The parties used the following laboratories to perform tests and provide COAs for
the Products: Eurofins, Tr. 1249; Advanced Laboratories, Tr. 2503; Covance, Tr. 2457; San
Rafael, Tr. 2447; Atlas Biosciences, Tr. 2425; and Intertek, Ex. 5083.

45.     The testing results from the foregoing laboratories produced conflicting results.
Tr. 1779, 1872; Exs. 144, 372, 650, 668, 5083.  Some results demonstrated that the Products met
their label claims while other results demonstrated that they did not.  Tr. 1896; Ex. 5083.

46.     The following list details advertising claims made by NatureWise and
corresponding test results demonstrating that those advertising claims were false and/or
inaccurate:

(a)     Labels for the Garcinias claimed 60 milligrams of potassium, but testing
demonstrated that certain lots had far less, Tr. 1059-63, 1871-72, 1859; Exs. 167.1, 181,
187, 188, 193, 372.107, 650, 668;

(b)     The Garcinias claimed 60% HCA, but testing demonstrated that certain
lots had less than 60%, Tr. 1095; Ex. 159;

(c)     The Garcinias claimed 300 milligrams of HCA on their labels, but testing
demonstrated that certain lots contained far less, Tr. 1856-57; Exs. 372.67, 372.69,
372.203,

(d)     The Garcinias claimed certain amounts of garcinia cambogia extract, but
testing demonstrated that certain lots did not match those claims, Ex. 372;

(e)     Labels on the Garcinias advertised that they were 100% pure and had no
fillers, binders, or artificial ingredients, but testing demonstrated that certain lots

contained excipients, binders, fillers, and/or artificial ingredients, Tr. 1857-58, 1871, 1875, 2349; Exs. 372, 372.69, 372.128, 372.177, 650, 5019.5;

(f)     Labels on the Garcinias advertised that they were vegetarian capsules, but testing demonstrated that certain lots contained protein and gelatin from animal sources, Tr. 1076-77, 1858, 1870; Exs. 161, 161.3, 168.1, 370.205, 370.206, 650, 668;

(g)     The Green Coffees claimed certain amounts of green coffee extract, but testing demonstrated that certain lots did not match those claims, Ex. 372;

(h)     NatureWise advertised the Green Coffees as being vegetarian, but various lots of the Green Coffees tested positive for gelatin from animal sources, Tr. 1077-77; Exs. 168.1, 161, 161.3;

(i)     Certain lots of the Green Coffees advertised 400 milligrams of chlorogenic acids on the labels, but testing demonstrated that some of those lots contained far less, Tr. 1853-54; Exs. 372.8, 372.10, 372.22, 372.28, 521; and

(j)     Labels on the Green Coffees advertised that they were 100% pure and had no fillers, binders, or artificial ingredients, but testing demonstrated that certain lots contained excipients, binders, fillers, and/or artificial ingredients.  Tr. 1860-62; Exs. 372. 123, 372.126, 372.130, 372.135, 372.152.

47.     The foregoing claims were material to consumers.  Tr. 850-51, 873-74, 877, 899, 909, 913-14, 922-23, 996, 999, 1007, 1034; Ex. 304A.

48.     Importantly, Doyle was aware that certain lots of the Products did not match their label claims.  Tr. 920-21, 945, 981-982, 1107-08, 1115-16, 1119-20; Exs. 111, 112, 112.1, 150, 150.2, 298.1.  Yet, even with that knowledge, NatureWise continued selling and distributing the Products without issuing any recalls.  Tr. 1783; Ex. 111.

49.     Moreover, even though Doyle know there were test results indicating that certain lots of the Products did not meet their label claims, NatureWise represented to a third-party auditor that none of its products had ever tested out of specification.  Tr. 2270, 2275; Exs. 124, 372.

## II.     Review Claims

### A.     Amazon

50.     An Amazon product page is comprised of product photos, a product title, product features, and a section for more detailed product features.  Tr. 85-86; Ex. 1.3.  The seller of the product controls the content of these four areas.  Tr. 87; Ex. 1.3.  Amazon provides a platform on the backend for third-party sellers to manage orders and customer communications.  Tr. 89.  Through this platform, the seller can input the product information manually, or use an excel file so Amazon can auto-populate these fields.  Tr. 89.  A seller can update the page at any time through these two methods.  Tr. 89-90.  Once updated, the information appears within one or two days.  Tr. 89-90.

51.     One component of the product page is a mini scoreboard that reflects the number of reviews and the average rating of the product indicated by stars.  The mini scoreboard is automatically updated by Amazon.  Tr. 90, 98; Ex. 1.3.  Each product on Amazon is given an ASIN.  Tr. 90-91.

52.     The "Best Seller" rank on Amazon reflects a ranking by category of the best-selling products and provides information on a product's position at a particular point in time within that product category.  This section is updated automatically by Amazon.  Tr. 92-93; Ex. 1.3.  Appearing in the top one or two results on Amazon's Best Seller list offers a competitive advantage over those products listed below.  Tr. 184-85.

53. Other components on a product page include the customer reviews section, the aggregate statistics of all reviews, the most helpful customer reviews, content of reviews, and comments on reviews. Tr. 94-99, Ex. 1.3. In addition, Amazon tracks what customers view in relation to a product page and uses this information to provide consumers with direct and side-by-side comparisons to similar items. Tr. 98-99; Ex. 374.2.

54. There are two types of reviews on Amazon product pages: verified and unverified reviews. Tr. 93-94; Ex. 1.3. To obtain a verified review, the reviewer must purchase the product without a discount. Tr. 93-94; Ex. 1.3. The verified review badge is automated by Amazon and determined purely based on whether the non-discounted purchase occurred. Tr. 93-94; Ex. 1.3. To leave an unverified review, any Amazon account holder can log in and leave a review. Tr. 94-95; Ex. 1.3. The name associated with the Amazon account appears on each review. Only one review for each product can be posted from a single Amazon account. Tr. 96; Ex. 1.3. Amazon account holders can vote up or down reviews to indicate a review's helpfulness, and account holders can vote up or down multiple reviews on one product page. Tr. 102-03. When leaving a review, an Amazon account holder selects the number of stars, from 1 to 5 stars, as a ranking of the product. Tr. 102-103; Ex. 1.3. When a new review is posted, the input immediately changes the product's score rating—adding to the total number of reviews, the total number of star rankings and the average star ranking. Tr. 97-98; Ex. 1.3.

55. Another section on each Amazon product page is titled, "Most Helpful Customer Reviews." Tr. 99-100; Ex. 1.5. In this section, the most helpful reviews are prominently displayed. Tr. 99-100; Ex. 1.5. Such reviews may be positive or negative and are determined by the number of "helpful" or "up" votes from customers. Tr. 99-100; Ex. 1.5. The device by which a review is voted up or down is a button asking whether the review is helpful or not, and

only those with an Amazon account can vote up or down on a review a single time.  Tr. 102-03; Ex. 1.3.  The reviews with the most helpfulness votes appear at the top of the first page of reviews.  Tr. 100; Ex. 1.5.  Conversely, the reviews voted least helpful are bumped down to later pages.  Tr. 101; Ex. 1.5.  Notably, only approximately ten reviews appear on each page, and most consumers do not read beyond the first set of reviews.  Tr. 101-02; Ex. 1.5.

56.     Reviews are important to consumers. Tr. 483.  In particular, the number of positive reviews is important to the buying decision of many customers.  Tr. 485; Ex. 669.259. Customers also generally care about star ratings.  Tr. 488.

57.     Good reviews are a factor in search results, and reviews are a factor in increased sales.  Tr. 759-760.

58.     In order to monitor reviews and ensure that reviews are legitimate, Amazon has an anti-manipulation policy for reviews.  Tr. 639-41.  That policy provides that "[a]ny attempt to manipulate reviews, including by directly or indirectly contributing false, misleading or authentic content, is strictly prohibited."  Tr. 640; Ex. 416.1; Malley-Naslund Dep. 59-60, Ex. 669.378-669.379.

### B.     Importance of Amazon Reviews to Consumers

59.     Vitamins Online presented testimony from a marketing and consumer survey expert, Michael Belch, Ph.D. ("Dr. Belch"), regarding the importance of online reviews to consumers.  Tr. 1268-80.  The Court finds that Dr. Belch was qualified and credible.

60.     There is very extensive and consistent literature that online reviews are an important part of almost all online purchasing decisions.  Tr.  1270, 1310.  The literature indicates that consumers use, rely upon, and trust online reviews in making purchasing decisions. Tr. 1270, 1351.

61.     More specifically, Amazon customers use and rely upon the website's online reviews when making purchasing decisions.  Tr. 1268-80.  Reviews on Amazon are very important to customers.  Tr. 483; Ex. 235.  The number of positive reviews that any given product has on Amazon is also important to and influential for customers.  Tr. 485-87; Ex. 333.  The number of reviews has an impact on sales.  Tr. 487.  Sellers on Amazon stand to gain financially from each positive review on their product pages.  Tr. 513.

62.     Similarly, customers care about products' star ratings.  Tr. 491; Ex. 334.  Even slight differences in star ratings can lead to much higher sales for higher rated products.  Tr. 491.

### C.     NatureWise's Reviews

63.     Doyle believed that Amazon reviews were critical to NatureWise's success.  Tr. 475-76.  Doyle also believed that reviews would have a direct effect on NatureWise's sales.  Tr. 586.

64.     Prior to the launch of the First Green Coffee, in May 2012, Doyle knew that customers had the capacity to post dishonest reviews on products that they had never received.  Tr. 577-78.  NatureWise launched the First Green Coffee in mid-to-late July 2012.  Tr. 420, 433.  Nevertheless, the First Green Coffee began receiving product reviews prior to its actual launch.  Tr. 436-37, 504-05; Ex. 571.  For example, the following reviews were posted on the First Green Coffee's Amazon product page prior to its launch:

(a)     A review stating that the customer had been taking the First Green Coffee for a couple of weeks, Tr. 498-99, 501; Exs. 571, 571D.1;

(b)     A review giving the First Green Coffee five stars and claiming that the customer had been taking the product for months, Tr. 504-05; Ex. 571;

(c)     A review explaining that the customer was seeing results of losing one pound every two weeks, Tr. 503-04; Exs. 571, 571D.3;

(d)     A review stating that the customer had lost eighteen pounds in the prior eighteen weeks, Tr. 504; Exs. 571, 571D.3;

(e)     A review referring to the specific milligrams being advertised by NatureWise and claiming to have been taking 800 milligrams as prescribed, twice per day, Tr. 505-06; Exs. 571, 571D.4;

(f)     A review explaining that the customer had been taking the product for approximately three weeks, Tr. 509; Exs. 571, 571D.8;

(g)     A review wherein the customer claimed that his spouse had lost eleven pounds over the prior three months, Tr. 509-10; Exs. 571, 571D.1;

(h)     A review stating that the customer had been taking the product for four weeks, Tr. 510-11; Exs. 571, 571D.19; and

(i)     A review claiming that the customer had experienced solid weight loss during the prior month.  Tr. 510-11; Exs. 571, 571D.19.

65.     By July 14, 2012, the First Green Coffee had more than seventeen four- and five-star reviews.  Tr. 503-04, 510-11; Exs. 571, 571D.3.  Notably, several of these early reviews came from unverified purchasers and appeared on the First Green Coffee's page all within fourteen minutes of each other and giving it five-star ratings.  Tr. 498; Exs. 571, 571D.1.  Likewise, fourteen of the five-star unverified reviews appeared on the First Green Coffee's product page within twenty-five minutes of each other and all ending with a similar pattern of including an exclamation point in the title of the review.  Tr. 511-12; Exs. 571, 571D.21.

66.     Similar to the First Green Coffee, the Second Green Coffee and the Garcinias also accumulated a substantial number of overwhelmingly positive reviews soon after their launch.  Tr. 262-63.  For example, by June 2014, the First Garcinia had more than 5,000 reviews filling

more than 500 pages.  Tr. 287-88; Ex. 322.2.  And, notably, may of the positive reviews on the Firs Garcinia received helpfulness votes almost immediately.  Tr. 289-90; Ex. 322.4.

67.     To analyze the foregoing anomalies of NatureWise's reviews, Vitamins Online presented testimony from a statistics and computer science expert, Julian McAuley, Ph.D. ("Dr. McAuley").  Dr. McAuley was qualified as an expert, Tr. 1394-97, 1401, and his testimony was credible.  Dr. McAuley authored a joint report with Vitamins Online's other statistics and review manipulation expert, Thomas "Tommy" Noonan ("Noonan"), Tr. 1401-02.  Noonan was qualified as an expert, Tr. 1515-28, 1531-32, and his testimony was credible.  Dr. McAuley's testimony related to the Green Coffees and the First Garcinia.  Tr. 1403; Ex. 701.  He analyzed data from 2012 to 2015 but did not include an analysis of the Second Garcinia.  Tr. 1403, 1405, 1407-08, Tr. 1532.  Conversely, Noonan's testimony covered all four of the Products, and he analyzed data through 2018.  Tr. 1403, 1405, 1407-08, 1532, 1535.  Noonan's analysis corroborated Dr. McAuley's analysis.  Tr. 1627-28.

68.     Based on the credible testimony of Dr. McAuley and Noonan, the court makes the following findings regarding the Products and their corresponding reviews:

(a)     NatureWise's unverified reviews had higher ratings than its verified reviews, Tr. 1418-21, 1429;

(b)     The Products had higher ratings than other products in the Health & Personal Care category (the "Random Sample"), Tr. 1426-27, 1429-30;

(c)     NatureWise's unverified reviews were significantly higher than the Random Sample, Tr. 1428-30;

(d)     The Products had an unusually high number of new reviewers compared to the Random Sample, Tr. 1432-34;

(e)     NatureWise reviewers had written more prior reviews than the typical reviewers for the Random Sample, Tr. 1433;

(f)     New NatureWise reviewers gave significantly higher ratings than customers who had previously written reviews on Amazon, Tr. 1437;

(g)     Reviewers of the Products had significantly higher similarities compared to other reviewers from the Random Sample, Tr. 1443-44; and

(h)     There were various periods of time in which the Products had an unusually large ratio of unverified reviewers and an unusually large ratio of reviewers that were highly positive, Tr. 1448-49.

69.     This data suggests that NatureWise engaged in review manipulation.  Tr. 1627-28.

### D.     NatureWise's Manipulation of Reviews

70.     NatureWise manipulated the Products' reviews.  It did so by (1) block voting on the helpfulness of reviews and (2) offering free products in exchange for reviews.

### 1.     Helpfulness Block Voting

71.     NatureWise engaged in block voting on the helpfulness of reviews—that is, NatureWise directed its employees, and its employees obliged, to up vote good reviews and down vote bad reviews, which directly affected which reviews appeared at the top of the Products' pages and those that did not.  Tr. 521, 523, 525, 531-534, 543, 545; Exs. 37.5, 279, 283.1, 304, 669.269.

72.     While Doyle testified that the block voting was only in response to attacks on NatureWise reviews by unknown third parties, Tr. 526:16-527:4, that testimony was not credible. For example, Doyle would direct employees to down vote reviews without mentioning purported attacks or distinguishing between "attacking" reviews and legitimate reviews.  Tr. 540-541; Exs.

260.1; 269.1.  Doyle also acknowledged that some of the one-star reviews that NatureWise's employees down voted may have been from real customers.  Tr. 597.

73.     Doyle further testified that NatureWise employees were allowed to vote their conscience.  Tr. 522.  That testimony was not credible.  Moreover, NatureWise management knew that their block voting was interfering with Amazon reviews, and they were worried about customers finding out.  Ex. 268.1-2.  Similarly, NatureWise management was wary of Amazon finding out about its block voting.  Tr. 593-594.

74.     NatureWise's conduct in block voting was a violation of Amazon's policies.  Tr. 641-44; Ex. 416; Malley-Naslund Dep. 59-63, 71, 81, Exs. 669.378-669.382, 669.390, 669.400. Doyle was familiar with Amazon's anti-manipulation policy.  Tr. 614, 616, 639, 640-641; Ex. 70.5.

### 2.     Free Products in Exchange for Reviews

75.     NatureWise offered free products to customers in exchange for reviews.  Tr. 625-626, 691; Ex. 48.1, 397.2.  Free products were contingent on customers providing a review.  Tr. 626-627; Ex. 34.  On several occasions, NatureWise denied having offered free product in exchange for a review, even though that was not true.  Tr. 827-828, 831; Exs. 198.1, 280.1.

76.     Doyle also asked customers to review other products so that their reviews of NatureWise products would have more credibility and so Amazon would not think NatureWise reviews were fake.  Tr. 659, 663, 677-678; Exs. 210, Ex. 287.1.

77.     The practice of offering free products in exchange for a review was a violation of Amazon's policies.  Tr. 680; Ex. 43.

78.     These types of review manipulation resulted in the deception of consumers, Tr. 1317-37, because such review manipulation was material to consumers, Tr. 916, 921; Exs. 557-60.

79.     As a result of these types of review manipulation, NatureWise experienced

significant financial success.  Tr. 485-87, 491, 513, 586; Ex. 333.  475-76.

### III.     Effect of NatureWise's Actions on Vitamins Online

80.     The NutriGold Products and the Products were direct competitors on Amazon.

Tr. 179-80, 187, 272, 464-64, 467, 471, 967, 980; Exs. 386.3, 380.2-3, 381.3, 386.3, 638.  In

addition, from at least NatureWise's launch in 2012 through the end of 2013, Vitamins Online

and NatureWise were the major players in the Amazon marketplace for garcinia cambogia and

green coffee products.  And, at that time, the existence and impact of other competitors was

minimal.  Tr. 180, 272, 425-26; Exs. 27, 65, 70.3, 88.1, 1058.

81.     Vitamins Online's NutriGold Garcinia was a "#1 Amazon top seller" prior to

NatureWise's entry into the market.  Tr. 270, 2628-29; Exs. 61.1, 88.1.  Notwithstanding the

existence of a few other garcinia cambogia competitors in the market, sales of NutriGold

Garcinia continually increased following its launch.  Exs. 580, 580.1, 588, Ex. 589.  However,

after NatureWise's emergence on Amazon, it replaced Vitamins Online's NutriGold Garcinia as

the #1 ranked product on the Amazon Best Sellers list for garcinia cambogia products.  Tr. 270;

Ex. 88.1.

82.     Vitamins Online's NutriGold Green Coffee was also a "#1 Amazon top seller"

prior to NatureWise's entry into the market.  Tr. 180, 272; Exs. 27, 61.1.  However, when

NatureWise emerged on Amazon, the Green Coffees replaced NutriGold as the #1 green coffee

product.  Tr. 180, 272; Ex. 27.

83.     Thus, for both garcinia cambogia and green coffee products on Amazon, the

Products replaced NutriGold Products as the #1 best sellers.  Tr. 180, 272, 425-26; Exs. 27, 70.3,

88.1.  Similarly, the Products replaced the NutriGold Products as the top products in Amazon's

search results.  Tr. 180, 272, 425-26; Exs. 65, 70.3, 1058.  Consequently, Vitamins Online's sales of the NutriGold Products dropped once NatureWise began selling the Products on Amazon.  Tr. 238-40, 267-68, 272, 1954-59, 1977-84; Exs. 578. 579. 580.

84.     Following NatureWise's rise on Amazon, the Products consistently obtained #1 rankings on the Amazon Best Sellers list and effectively replaced the NutriGold Products.  Tr. 283-84; Ex. 322.1.

85.     However, by 2014, the markets for green coffee and garcinia cambogia on Amazon were inundated with competitors such that Vitamins Online and NatureWise were no longer the two major players in the relevant marketplace.  Tr. 256, 266; Exs. 5146, 5147.

**IV.     NatureWise's Revenue**

86.     Vitamins Online presented testimony from Dr. Stan Smith ("Smith") to establish NatureWise's profits from selling the Products.  Tr. 1945-48.  Smith was a credible and well-qualified witness, Tr. 1940-41, and he used reasonable and appropriate methodologies in performing his work in this case.  Tr. 1947-50.  Smith determined that, in the years 2012 and 2013, NatureWise made $7,251,118 in revenue from selling the Green Coffees.  Exs. 588, 589.  During that same time period, NatureWise made $2,300,114 in revenue from selling the First Garcinia.  Exs. 588, 589.  Thus, from 2012 through 2013, NatureWise's revenue from selling the Green Coffees and the First Garcinia totaled $9,551,232.  Exs. 588, 589.

87.     NatureWise presented testimony from Richard Hoffman ("Hoffman") to rebut Smith's calculation of NatureWise's profits.  Tr. 2571-74.  In reaching his own calculation of NatureWise's profits, Hoffman was directed by Doyle to exclude certain profits.  Tr. 2656-62.  Hoffman also relied upon spreadsheets and information provided to him by NatureWise, but he did not conduct any independent investigation into the accuracy of those spreadsheets or

information.  Tr. 2656-62.  In addition, prior to performing his calculation, NatureWise informed Hoffman that it did not have record of its revenues by each specific product prior to 2014.  Tr. 2674-76.  Thus, Hoffman acknowledged that his calculation of NatureWise's profits for 2012 and 2013 was an estimate based on data from later years.  Tr. 2675-78.

88.     Because (1) Doyle was not a credible witness; (2) Hoffman acknowledged that his calculation for 2012 and 2013 was a mere estimate; and (3) NatureWise explained to Hoffman that it did not have record of its revenues by each specific product prior to 2014, Hoffman's calculations of NatureWise's revenue, costs, and deductions in the years 2012 and 2013 were unreliable and flawed.  Therefore, the court adopts Smith's calculation of NatureWise's profits for 2012 and 2013.

### V.     NatureWise's Discovery Improprieties

89.     Doyle understood that he had a duty to preserve information related to this lawsuit.  Tr. 733; Ex. 1023.2.  Nevertheless, Doyle failed to apprise all of the NatureWise employees of the obligation to preserve information.  Exs. 640, 1023.  Moreover, Doyle and/or NatureWise failed to preserve or produce evidence in the following manners:

(a)     Despite being aware of his duty to preserve evidence by early October 2013, on or around October 27, 2013, Doyle cleaned out his email and trash and reported that he could therefore not find a certain document. Ex. 5057.

(b)     Although Doyle contends that he sent hundreds of emails to Amazon regarding fake reviews, NatureWise did not produce them.  Tr. 649.

(c)     Doyle continued deleting emails.  Tr. 519-520.

(d)     Third parties produced multiple emails and documents in response to subpoenas that NatureWise failed to produce.  Notably, many of these emails contained

information detrimental to NatureWise's position.  Exs. 48, 50, 57, 61, 63, 67, 94, 95, 98, 99, 112, 122, 123, 124, 125, 131.

(e)     Doyle deleted videos that he had made and posted online after he was aware of his duty to preserve information.  NatureWise then failed to produce these videos in discovery.  Tr. 228, 445-46, 449-50, 461; Exs. 91, 92, 640.

(f)     In a previous declaration submitted by Doyle in this case, he informed the court that NatureWise used Office AutoPilot only as an autoresponder system, and communicated that the only relevant information that would have been in Office AutoPilot would have been emails.  Ex. 408.3, ¶ 2.  Doyle submitted that none of the remaining information in Office AutoPilot was relevant to this case.  Ex. 408.2.  But at trial, Doyle admitted that Office AutoPilot contained a significant amount of information beyond emails, and that such information and data had been transferred to another system.  Tr. 723; Ex. 408.1.  That additional information and data was essential to this case.  Tr. 455; Ex. 92.5.  Doyle admitted that he did not disclose the extent of the use of Office AutoPilot in his declaration.  Tr. 724-25; 408.2.  NatureWise never produced the Office AutoPilot database in this case.  Tr. 713-721; Exs. 92.5, 408.2.

(g)     NatureWise never produced any product SOPs or specification sheets, and claimed, prior to trial, that such documents did not exist.  Tr. 1131; Ex. 649.1.

(h)     NatureWise never produced the statistical analysis that it presented to Amazon to show that reviews posted to NatureWise's product pages were fake.  Tr. 741-743.

90.     Again, the court finds that Doyle's explanations to the foregoing discovery issues were not credible.

## CONCLUSIONS OF LAW

### I.     The Adverse Inference Rule

1.     "The adverse inference rule provides that when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him." *Wardrip v. Hart*, 949 F. Supp. 801, 804 (D. Kan. 1996) (citing *Gilbert v. Cosco Inc.*, 989 F.2d 399, 406 (10th Cir.1993)).  Because NatureWise failed to preserve and produce relevant evidence in this case, the court will apply the adverse inference rule to each element of Vitamins Online's claims and assume that the evidence NatureWise failed to preserve and produce was unfavorable to it.

2.     In addition, the court notes that it has already imposed spoliation sanctions for Category 1 Products—that is, NatureWise garcinia cambogia and green coffee products for which there were no existing samples for testing.  ECF No. 155.  More specifically, the court determined that Vitamins Online was entitled to an adverse inference instruction that the Category 1 Products bore all of the allegedly false Ingredients Claims alleged in the Complaint and that they failed to meet those label claims.  *Id.*  Because NatureWise has failed to adequately rebut the adverse inference, the court finds and concludes that NatureWise's Category 1 Products did not meet their label claims.

### II.     Lanham Act False Advertising Claim

3.     Vitamins Online's first claim is for false advertising under the Lanham Act.

4.     The Lanham Act provides that:

(1) [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to

29

the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

   (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (2012).

   5.  To establish a false advertising claim under the Lanham Act, a plaintiff must show (1) that the defendant used a device or made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that misrepresents or is/are likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injure the plaintiff.[3] *See* 15 U.S.C. § 1125(a)(1); *Cottrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1252 (10th Cir. 1999); *Vitamins Online, Inc. v. HeartWise, Inc.*, No. 2:13-CV-00982-DAK, 2019 WL 6682313, at *8 (D. Utah Sept. 24, 2019); *Vitamins Online, Inc. v. HeartWise*, Inc., 207 F. Supp. 3d 1233, 1237–44 (D. Utah 2016), *order vacated in part on reconsideration*, No. 2:13-CV-982-DAK, 2017 WL 2733867 (D. Utah May 11, 2017).

   6.  In addition to the foregoing elements, some courts also list materiality as another element of a Lanham Act claim, *see Novell, Inc. v. Network Trade Center, Inc.*, 25 F. Supp. 2d 1218, 1227-28 (D. Utah 1997), but the Tenth Circuit has not yet decided "whether the Lanham Act imposes a materiality inquiry," *Gen. Steel Domestic Sales, LLC v. Chumley*, 627 F. App'x 682, 685 (10th Cir. 2015).

---

  [3] As the court has done in prior rulings, the court will refer to the foregoing elements as the (1) "falsity"; (2) "commerce"; (3) "deception"; and (4) "injury" elements.

### A.   Falsity and Deception

7.      A plaintiff can establish falsity by either showing that the defendant used a device, *Vitamins Online*, 207 F. Supp. 3d at 1242, or made false or misleading representations of fact in connection with the commercial advertising or promotion of its product, *Cottrell*, 191 F.3d at 1252 (10th Cir. 1999).  "To constitute commercial advertising or promotion . . . , the statements identified by [the plaintiff] 'must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services . . . [and] (4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry.'" *Strauss v. Angie's List, Inc.*, 951 F.3d 1263, 1267 (10th Cir. 2020).

8.      If proceeding based on a false or misleading representation of fact, a plaintiff "can either show that the representations are literally false or impliedly false." *Vitamins Online*, 2016 WL 538458, at *6.

9.      A representation is literally false when it states that a product "has certain qualities that it in fact does not actually have" and is impliedly false when the "statements . . . , while literally true or ambiguous, convey a false impression or are misleading in context, as demonstrated by actual consumer confusion." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 13–14 (7th Cir. 1992).

10.     For literally false statements, "the message may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Interlink Products Int'l Inc. v. F & W Trading*, No. 15–1340 (MAS) (DEA), 2016 WL 1260713, at *9 (D.N.J. Mar. 31, 2016) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.*,

31

290 F.3d 578, 586–87 (3d Cir. 2002)).  "Only an *unambiguous* message can be literally false."

*Buetow v. A.L.S. Enterprises, Inc.*, 650 F.3d 1178, 1185 (8th Cir. 2011) (emphasis in original)

(quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007)).

Importantly, when a statement or advertisement "can reasonably be understood as conveying

different messages, [a] literal falsity argument must fail."  *Buetow*, 650 F.3d at 1185 (quoting

*Scotts Co. v. United Ind. Corp.*, 315 F.3d 264, 275 (4th Cir. 2002)).

  11. For a false statement to be actionable under the Lanham Act, it must be a false

statement of fact.  *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495–96 (5th Cir.

2000); *Groden v. Random House, Inc.*, 61 F.3d 1045, 1051 (2d Cir. 1995).  And for a statement

of fact to be actionable, it "must be a 'specific and measurable claim, capable of being proved

false or of being reasonably interpreted as a statement of objective fact.'"  *Am. Italian Pasta Co.

v. New World Pasta Co.*, 371 F.3d 387, 391 (8th Cir. 2004) (quoting *Coastal Abstract Serv., Inc.

v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir.1999)).

  12. When a statement or representation is deemed to be literally false, the deception

element is presumed.  *Procter & Gamble Co. v. Haugen*, 627 F. Supp. 2d 1287, 1290 (D. Utah

2008); *see Zoller Labs., LLC. v. NBTY, Inc.*, 111 F. App'x 978, 982 (10th Cir. 2004); *see also

PBM Prod., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th Cir. 2011).  Conversely, when

the statement at issue is impliedly false, a plaintiff must demonstrate actual consumer deception.

*Vincent v. Utah Plastic Surgery Soc.*, 621 Fed. App'x. 546, 550 (10th Cir. 2015).  Actual

consumer deception must be shown by extrinsic evidence that demonstrates that the challenged

statements "tend to mislead or confuse consumers."  *Nunes v. Rushton*, 299 F. Supp. 3d 1216,

1239 (D. Utah 2018) (quoting *Zoller Labs.*, 111 F. App'x at 982).

  13. Yet, even under a theory of implied falsity, a plaintiff's failure to demonstrate that

consumers were actually deceived is not fatal to his or her claim.  Indeed, a plaintiff can still

benefit from a presumption of consumer deception for statements that are impliedly false if the

plaintiff can show that the defendant acted with the intent to deceive consumers.  *Cashmere &*

*Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 316 (1st Cir. 2002); *see also Merck*

*Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 256 (2d Cir. 2014); *William H. Morris Co. v. Grp. W,*

*Inc.*, 66 F.3d 255, 258 (9th Cir. 1995), *supplemented sub nom. William H. Morris Co. v. Grp. W.*

*Inc.*, 67 F.3d 310 (9th Cir. 1995).

### 1.      Ingredients Claims

14.      As mentioned above, the court concludes that the Category 1 Products did not

meet their label claims.  Consequently, the court finds those claims were literally false, and

Vitamins Online is therefore entitled to a presumption of deception.  NatureWise failed to rebut

that presumption.  Consequently, with respect to Category 1 Products, the court concludes that

Vitamins Online has established the falsity and deception elements.

15.      As to the Products in general, the court first concludes that NatureWise failed to

keep the necessary documentation to keep track of the Green Coffees and the Garcinias that it

was selling.  Indeed, NatureWise represented that it did not and cannot track which labels were

used on which bottles for each lot/batch of the Products that it produced.  Likewise, NatureWise

represented that it does not know which labels it used on the Products at different times or on

specific dates, and it does not know during which period it sold certain lots/batches.  Therefore,

because of NatureWise's failure to maintain the foregoing information, the court makes the

following legal conclusions with respect to the Products, but does not differentiate between

lots/batches:

(a)      As to certain lots, NatureWise's claim that the First Green Coffee contained 50% chlorogenic acid was literally false;

(b)      As to certain lots, NatureWise's claim that the First Green Coffee contained "Clinically Proven GCA" was literally false;

(c)      NatureWise's claims that the First Green Coffee contained the amount of GCA that corresponded with the GCA study were literally false by necessary implication;

(d)      NatureWise's claim that the First Green Coffee was clinically proven after having knowledge that the GCA study was flawed and retracted was literally false;

(e)      As to certain lots, NatureWise's claims that the Green Coffees were vegetarian were literally false;

(f)      As to certain lots, NatureWise's claims that the Green Coffees contained specific amounts of green coffee extract were literally false;

(g)      As to certain lots, NatureWise's claims that the Green Coffee contained 400 milligrams of chlorogenic acids were literally false;

(h)      As to certain lots, NatureWise's claim that the Green Coffees contained no fillers, binders, or artificial ingredients was literally false.

(i)      NatureWise's representations that the First Garcinia had SuperCitrimax were literally false;

(j)      NatureWise's claims that the First Garcinia contained a clinically proven and patented form of HCA bound to calcium and potassium were literally false;

(k)      As to certain lots, NatureWise's claims that the Garcinias were vegetarian were literally false;

34

(l)      As to certain lots, NatureWise's claim that the Garcinias contained 60 milligrams of potassium was literally false;

(m)      As to certain lots, NatureWise's claim that the Garcinias contained 60% HCA was literally false;

(n)      As to certain lots, NatureWise's claim that the Garcinias contained 60 milligrams of potassium was literally false;

(o)      As to certain lots, NatureWise's claim that the Garcinias contained 300 milligrams of HCA was literally false;

(p)      As to certain lots, NatureWise's claim regarding the specific amount of garcinia cambogia extract was literally false;

(q)      As to certain lots, NatureWise's claim that the Garcinias contained no fillers, binders, or artificial ingredients was literally false; and

(r)      For much of 2012 and 2013, NatureWise's claims, regarding the Green Coffees and the First Garcinia, that (1) each ingredient it used was verified for purity through in-house testing; (2) it had implemented a strict set of FDA compliant manufacturing procedures; and (3) its facilities were regularly inspected by FDA officials were literally false because NatureWise did not know who was making those products.

16.      The court concludes that NatureWise made the above representations and statements in connection with the commercial advertising and promotion of the Products because (1) NatureWise's representations were commercial speech; (2) NatureWise is in commercial competition with Vitamins Online; (3) the purpose behind the statements was to influence consumers to purchase the Products; and (4) NatureWise disseminated the statements sufficiently to the relevant purchasing public.

17.     Therefore, Vitamins Online has established the falsity element for its Ingredients Claims.  Moreover, because Vitamins Online has demonstrated that NatureWise's foregoing statements were literally false, Vitamins Online is entitled to a presumption that consumers were, in fact, deceived by such statements.  NatureWise failed to rebut that presumption.  Therefore, Vitamins Online has also established the deception element for its Ingredients Claims.

18.     The court also concludes that, even if the foregoing claims were impliedly false, Vitamins Online would nevertheless be entitled to a presumption of deception because the court concludes that NatureWise and Doyle acted with the intent to deceive consumers.  Because NatureWise also failed to rebut that presumption, Vitamins Online has established falsity and deception under either theory of literal or implied falsity.

### 2.     Review Claims

19.     As to the Review Claims, the court reaches the following legal conclusions with respect to falsity and deception:

(a)     NatureWise's practice of block voting on the helpfulness of reviews constitutes the use of a device in connection with the commercial advertising or promotion of its products;

(b)     As a result of NatureWise's practice of block voting, the number of helpfulness votes on certain NatureWise reviews were artificially inflated and literally false; and

(c)     NatureWise's representations that it did not offer free products in exchange for reviews were literally false.

20.     Importantly, the court has already determined that NatureWise's conduct related to the Review Claims constitutes commercial advertising or promotion under the falsity element.

*Vitamins Online*, 207 F. Supp. 3d at 1242.  Therefore, Vitamins Online has established the falsity element for its Review Claims.  Moreover, because Vitamins Online has demonstrated literal falsity, Vitamins Online is entitled to a presumption that consumers were, in fact, deceived.  The court concludes that NatureWise failed to rebut that presumption.  Therefore, Vitamins Online has established the deception element for its Review Claims.

21.     The court also concludes that, even if the foregoing claims were impliedly false, Vitamins Online would nevertheless be entitled to a presumption of deception because the court concludes that NatureWise and Doyle acted with the intent to deceive consumers.  Because NatureWise failed to rebut that presumption, Vitamins Online has established falsity and deception under either theory of use of a device, literal falsity, or implied falsity.

### B.     Commerce

22.     NatureWise has not contested the commerce element of Vitamins Online's Lanham Act claim.  *Vitamins Online*, 2019 WL 6682313, at *8.  Regardless, the court concludes that NatureWise's actions and statements were made in commerce as required by the Lanham Act.  *See* 15 U.S.C. § 1125(a).

### C.     Materiality

23.     As noted above, the Tenth Circuit has not squarely addressed whether materiality is a necessary element of a Lanham Act claim.  Nevertheless, the court will address it in this case.  As explained by the Tenth Circuit: "Though not explicitly mentioned in the text of the Lanham Act, many courts require plaintiffs to prove that a false or misleading advertisement is 'likely to influence the purchasing decision' before permitting recovery based on it.  Circuits that have imposed a materiality requirement are, however, split over who bears the burden of proof: some keep it with the plaintiff while others are willing to presume that at least some

misstatements—usually literally false ones—are material." *Gen. Steel*, 627 F. App'x at 685 (citations omitted). Further, the Second Circuit has articulated that "in many cases the evidence and the findings by [a] court that a plaintiff has been injured or is likely to suffer injury will satisfy the materiality standard—especially where the defendant and plaintiff are competitors in the same market and the falsity of the defendant's advertising is likely to lead consumers to prefer the defendant's product over the plaintiff's." *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 70–71 (2d Cir. 2016).

24. Based on this standard, the court concludes that Vitamins Online has established that NatureWise's misrepresentations with respect to both the Ingredients Claims and the Review Claims were material to consumers. Indeed, Vitamins Online has demonstrated that NatureWise's misrepresentations were likely to influence consumers' purchasing decisions. This is especially true when viewing NatureWise's misrepresentations in the context of Dr. Oz's recommendations to consumers.

25. Furthermore, given the court's conclusion that NatureWise's statements and representations were literally false, Vitamins Online is entitled to a presumption that those literally false statements and representations were material to consumers. *Pizza Hut*, 227 F.3d at 497. Because NatureWise has failed to rebut that presumption, the court concludes that NatureWise's literally false statements and representations were material to consumers.

26. Lastly, as will be explained in detail below, because Vitamins Online and NatureWise were direct competitors in a sparsely populated market, the court presumes that NatureWise's misrepresentations injured Vitamins Online. Thus, on that additional basis, the court concludes that Vitamins Online has satisfied the materiality element.

### D.   Injury

27.   To establish the injury element of a Lanham Act false advertising claim, a plaintiff "must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014).  Put differently, a plaintiff must provide evidence of "an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Id.* at 140.

28.   The standard for determining whether a plaintiff has provided sufficient evidence of injury is dependent on the relief that the plaintiff is seeking.  *See Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1335 (8th Cir. 1997) ("[C]ases involving injunctive relief and those seeking monetary damages under the Lanham Act have different standards of proof.").  When a plaintiff is seeking injunctive relief, the "plaintiff does not need to establish actual damages, and is instead held to a lesser standard of proving that it is likely that the defendant's advertising has caused or will cause plaintiff injury."  *Berken v. Jude*, No. 12-CV-02555-RPM, 2013 WL 6152347, at *2 (D. Colo. Nov. 22, 2013).  In other words, when the plaintiff is seeking an injunction, "[t]he statute demands only proof providing a reasonable basis for the belief that the plaintiff is likely to be damaged as a result of the false advertising" and not "proof of actual loss and specific evidence of causation."  *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir. 1980).

29.   In contrast, a "heightened level of . . . proof of causation and specific injury" is required when the plaintiff is seeking money damages, *Porous Media Corp.*, 110 F.3d at 1335–36, in order to "prevent the plaintiffs from receiving a windfall unrelated to their own damages,"

*Berken*, 2013 WL 6152347, at *2.  And, as this court has previously determined, the standard of proof required when a plaintiff is seeking disgorgement is somewhere between the standards for money damages and injunctive relief.  *Vitamins Online*, 2019 WL 6682313, at *15.  In this case, Vitamins Online seeks disgorgement and injunctive relief.

30.     There are certain circumstances that allow a plaintiff to benefit from a presumption of injury in Lanham Act false advertising cases.  *Id.* at *13.  For example, courts will apply a presumption of injury in cases involving (1) comparative advertising, *Munchkin, Inc. v. Playtex Prod., LLC*, 600 F. App'x 537 (9th Cir. 2015), or (2) "direct competitors in a sparsely populated market," *Church & Dwight*, 843 F.3d at 72 n.12.

31.     In this case, the court concludes that Vitamins Online and NatureWise were direct competitors in a sparsely populated market from 2012 through 2013.[4]  However, after 2013, there was a flood of competitors into the market such that the market was no longer sparsely populated.  Accordingly, for the years 2012 and 2013, Vitamins Online is entitled to a presumption of injury.  That presumption, though, applies only to Vitamins Online's economic injury; it does not apply to Vitamins Online's alleged reputational injury.  This is so because NatureWise adequately rebutted the presumption as to reputational injury.  Indeed, the court concludes that NatureWise established that it did not cause Vitamins Online reputational injury.  However, NatureWise failed to rebut the presumption of economic injury for 2012 and 2013.  Therefore, for 2012 and 2013, Vitamins Online has established that NatureWise's conduct

---

[4] The court notes that, in its previous decisions on the parties' motions for summary judgment, it concluded that this case did not involve direct competitors in a sparsely populated market.  *Vitamins Online*, 2019 WL 6682313, at *13.  However, now that the court has been presented with all of the evidence at trial, the court concludes that Vitamins Online and NatureWise were direct competitors in a sparsely populated market from the time that NatureWise launched in 2012 through the end of 2013.

proximately caused it economic injury such that Vitamins Online has established the injury element of its claim.

32.     As to the remaining years, Vitamins Online is not entitled to a presumption of injury.  Thus, Vitamins Online was required to demonstrate that it suffered economic or reputational injury that was proximately caused by NatureWise's misrepresentations.  The court concludes that it failed to do so.  While Vitamins Online did produce some evidence, that evidence was insufficient to establish that NatureWise's actions proximately caused injury to Vitamins Online.  Once the market was flooded with competitors.  Once there were a multitude of competitors for green coffee and garcinia cambogia products on Amazon, one sale for NatureWise was not necessarily a lost sale for Vitamins Online.  Instead, a sale for NatureWise could have meant a lost sale for any of the other Amazon competitors.

33.     Therefore, the court concludes that Vitamins Online has established each of the elements of its Lanham Act false advertising claim for the years 2012 and 2013.  Accordingly, the court finds Vitamins Online's liable for false advertising under the Lanham Act.

### III.    Utah Common Law Unfair Competition Claim

34.     Vitamins Online's second claim is for common law unfair competition.  "Pursuant to Utah common law, unfair competition includes—*but is not limited to*—passing off, palming off, imitating, and causing or *likely causing* confusion or deception."  *Overstock.com, Inc. v. SmartBargains, Inc.*, 2008 UT 55, ¶ 13, 192 P.3d 858, 862 (emphasis added).

35.     In this case, the court concludes that Vitamins Online has established its unfair competition claim.  The foregoing Findings of Fact and Conclusions of Law demonstrate that NatureWise unfairly competed in the garcinia cambogia and green coffee markets on Amazon.  Indeed, there is ample evidence demonstrating that NatureWise's actions, as detailed above,

resulted in a high likelihood of deception in the relevant markets on Amazon.  Moreover, the

court's analysis with respect to Vitamins Online's Lanham Act claim applies with equal force to

its second claim.  Therefore, NatureWise is liable for unfair competition under Utah common

law.

## IV.    Remedies

36.    As previously mentioned, Vitamins Online seeks the recovery of NatureWise's

ill-gotten profits through disgorgement in addition to injunctive relief.

### A.    Disgorgement

37.    Section 35 of the Lanham Act provides that, when a plaintiff has established a

claim for false advertising, the plaintiff is entitled, "subject to the principles of equity, to recover

. . . defendant's profits."  15 U.S.C. § 1117.

38.    The Tenth Circuit has held that "[u]nder the Lanham Act, plaintiffs must show

either actual damages or willful action on the part of the defendant as a prerequisite to recover

disgorgement of profits."  *Klein-Becker USA, LLC v. Englert*, 711 F.3d 1153, 1161 (10th Cir.

2013).  However, the Supreme Court recently clarified that a finding of willfulness can no longer

be a mandatory prerequisite to an award of the defendant's profits.  *See Romag Fasteners, Inc. v.

Fossil, Inc*., 140 S. Ct. 1492, 1494–95 (2020).  Nevertheless, the Supreme Court noted that

willfulness is still "a highly important consideration in determining whether an award of profits

is appropriate."  *Id.* at 1497.  As such, the court will consider willfulness as it "weigh[s] the

equities to fashion a remedy that matches the harm."  *Klein-Becker*, 711 F.3d at 1162.  In

addition to willfulness, other equitable considerations may include, among other things, "(1) the

degree of certainty that the defendant benefited from the unlawful conduct; (2) availability and

adequacy of other remedies; (3) the role of a particular defendant in effectuating the

infringement; (4) plaintiff's laches; and (5) plaintiff's unclean hands." *Gen. Steel Domestic Sales, LLC v. Chumley*, No. 10-CV-01398-PAB-KLM, 2013 WL 1900562, at *17 (D. Colo. May 7, 2013), *aff'd*, 627 F. App'x 682 (10th Cir. 2015).

39.     Here, the court concludes that disgorgement of NatureWise's profits from 2012 and 2013 is an appropriate remedy.  First, there is little doubt, if any, that NatureWise benefitted from its unlawful actions.  NatureWise quickly rose to the top of Amazon sales rankings and made millions of dollars in a matter of months despite having no previous experience in the industry.  Second, other remedies would be inadequate.  As will be described below, it would be against the public interest to impose a permanent injunction in this case.  And, even though Vitamins Online is not seeking actual damages, actual damages are rather difficult to accurately calculate in a false advertising case.  Third, Vitamins Online bears no unclean hands with respect to NatureWise's actions.  Fourth, Vitamins Online did not delay in seeking relief.  Fifth, NatureWise's actions were willful in that NatureWise and Doyle sought to intentionally deceive consumers.  Indeed, Doyle willfully made false representations with respect to the Products and artificially altered reviews in order to make NatureWise more profitable.  Sixth, as a result of testing, NatureWise had knowledge that certain lots of the Products did not match their label claims.  Yet, even with that knowledge, NatureWise continued selling those products and never issued any recalls.  And seventh, NatureWise's discovery improprieties, as explained above, favor disgorgement.  Therefore, the disgorgement of NatureWise's ill-gotten profits in 2012 and 2013 is a warranted and appropriate remedy.

40.     Now that the court has determined that disgorgement of NatureWise's profits is warranted, the court must determine the amount.  Section 35 of the Lanham Act provides that, after a plaintiff has established his or her claim, and the court has determined that disgorgement

is warranted, "the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."  15 U.S.C. § 1117.

41.     Here, as explained in the Findings of Fact, Vitamins Online has demonstrated that, in 2012 and 2013, NatureWise's sales profits from the Green Coffees and the First Garcinia totaled $9,551,232.[5]

42.     Given that Vitamins Online has met its initial burden of proving NatureWise sales, the burden then shifts to NatureWise to prove all elements of cost or deduction. NatureWise, however, failed to carry that burden.  As detailed in the Findings of Fact, NatureWise represented that it did not have record of its revenues by each specific product prior to 2014.  Thus, Hoffman's calculations of NatureWise's 2012 and 2013 profits, and the costs and deductions associated with those profits, were a mere estimate and therefore unreliable.  As such, the court concludes that NatureWise has failed to produce adequate evidence demonstrating any costs or deductions associated with its 2012 and 2013 profits.

43.     The court therefore concludes that the profits attributable to NatureWise's false advertising in violation of the Lanham Act amounts to $9,551,232.  As such, the court awards Vitamins Online $9,551,232 in disgorged profits from NatureWise—$7,251,118 for the Green Coffees and $2,300,114 from the First Garcinia.  The court orders NatureWise to make payment thereof to Vitamins Online.

44.     In addition, there is a preference in the Tenth Circuit to award prejudgment interest in this type of case.  *See*, *e.g.*, *United Phosphorous Ltd. v. Midland Fumigant, Inc.,* 205 F.3d 1219, 1236–37 (10th Cir. 2000) ("[T]his Court has adopted a preference, if not a

---

[5] The court notes that NatureWise did not begin selling the Second Garcinia until 2015. Thus, because the court has limited disgorgement to 2012 and 2013, it need not consider the Second Garcinia.

presumption, for prejudgment interest."); *FDIC v. UMIC, Inc.,* 136 F.3d 1375, 1388 (10th Cir.

("[P]rejudgment interest normally should be awarded on successful federal claims.");

*EarthGrains Baking Companies, Inc. v. Sycamore Family Bakery Inc.*, No. 2:09CV523DAK,

2012 WL 2419953, at *2 (D. Utah June 26, 2012).  Accordingly, the court concludes that

prejudgment interest in this case is warranted.

45.     In determining the appropriate interest rate, federal courts are "free to choose any

interest rate which would 'fairly compensate the plaintiff for the delay in the receipt of

payment.'"  *Towerridge, Inc. v. T.A.O., Inc.,* 111 F.3d 758, 764 (10th Cir. 1997); *EarthGrains*,

2012 WL 2419953, at *2.  Here, in its discretion, the court looks to Utah law for guidance, and

concludes that Utah's post-judgment rate of 2.13% per annum, as of January 1, 2014, is an

appropriate interest rate.  *See* https://www.utcourts.gov/resources/intrates/historic.html.

Accordingly, the court awards Vitamins Online simple prejudgment interest of 2.13% per

annum, with accrual beginning on January 1, 2014.[6]

46.     As to the Utah common law unfair competition claim, while it appears that Utah

courts have not explicitly addressed the remedies available for unfair competition, the

Restatement (Third) of Unfair Competition permits recovery for actual damages or an award of

the defendant's profits.  Restatement (Third) of Unfair Competition § 37.  A district court will

consider the same or similar factors when considering whether to award a defendant's profits

---

[6] In Lanham cases, courts generally award simple prejudgment interest instead of
compound prejudgment interest.  *See Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star
Mark Mgmt., Inc.*, No. 04-CV-2293 SMG, 2009 WL 5185808, at *10 (E.D.N.Y. Dec. 23, 2009),
*aff'd*, 409 F. App'x 389 (2d Cir. 2010); *Sherwood Brands of Rhode Island, Inc. v. Smith
Enterprises, Inc.*, No. CIV.A. 00-287T, 2003 WL 22061871, at *3 (D.R.I. Mar. 31, 2003).
Furthermore, under Utah law, "[c]ompound interest is not favored," and "interest . . . should be
calculated simply unless agreed to otherwise by the parties."  *City of Hildale v. Cooke*, 2001 UT
56, ¶ 36, 28 P.3d 697, 707 (quoting *Watkins & Faber v. Whiteley*, 592 P.2d 613, 616 (Utah
1979)).  Accordingly, the court awards simple prejudgment interest in this case.

under the Lanham Act or Utah common law.  *See id.* § 36 cmt. b, § 37.  The only possible

distinction is that an award of lost profits under Utah law requires willfulness, whereas an award

under the Lanham Act, does not, in light of the Supreme Court's decision in *Romag*.  *See id.* § 37

cmts. c, e.  Regardless, the court has found that NatureWise and Doyle acted willfully.

47.     The court therefore concludes that disgorgement is also warranted for Vitamins

Online's Utah common law unfair competition claim.  Thus, the court awards Vitamins Online

$9,551,232 in disgorged profits from NatureWise—$7,251,118 for the Green Coffees and

$2,300,114 from the First Garcinia.  This award of profits is not in addition to the award of

profits for Vitamins Online's Lanham Act claim.  The court is merely recognizing that Vitamins

Online is entitled to the same disgorgement damages under both legal avenues.  Accordingly,

Vitamins Online is awarded $9,551,232 in disgorged profits from NatureWise for *either* its

Lanham Act claim *or* its Utah common law unfair competition claim—Vitamins Online is not

awarded an independent $9,551,232 for each claim.

48.     The court concludes that prejudgment interest is also warranted with respect to

Vitamins Online's common law unfair competition claim.  Whether a party is entitled to

prejudgment interest under Utah law turns upon whether the damages are subject to calculation,

as opposed to the types of damages that are not calculated, such as are awarded for personal

injuries.  The standard of recovery under Utah law is aptly explained in *Encon Utah, LLC v.*

*Fluor Ames Kraemer, LLC*:

> Prejudgment interest may be recovered where the damage is complete, the
> amount of the loss is fixed as of a particular time, and the loss is measurable by
> facts and figures.  Prejudgment interest is appropriate when the loss ha[s] been fixed
> as of a definite time and the amount of the loss can be calculated with mathematical
> accuracy in accordance with well-established rules of damages.  The trial court
> adopted a semblance of this language, ruling that prejudgment interest was
> appropriate because Encon's damages were "subject to mathematical calculation.

Each of these iterations of the standard for recovering prejudgment interest is correct. None suggests or requires, as the FAK parties claim, that at the time the damages accrued, all of the damage figures must be known and remain static throughout the litigation. Rather, the standard focuses on the measurability and calculability of the damages.

The court of appeals has explained that "losses that cannot be calculated with mathematical accuracy are those in which damage amounts are to be determined by the broad discretion of the trier of fact, such as in cases of personal injury, wrongful death, defamation of character, and false imprisonment. Thus, prejudgment interest is inappropriate in cases where the trier of fact is left to assess damages based on "a mere description of the wrongs done or injuries inflicted.

We have held that prejudgment interest is appropriate in cases where the amount due under [a] contract was ascertainable by calculation and it was only the method to be used in making the calculation that was uncertain.

Therefore, where damage figures must be determined by the trier of fact in its exercise of discretion, prejudgment interest is inappropriate. Where damage figures are subject to calculation, however, even if the method of calculating is uncertain, or the damage figures change, prejudgment interest is appropriate. The trial court recognized this important distinction and noted that, although various elements of Encon's termination claim may have been disputed as to amount, the claim has been subject to mathematical calculation since the date it was submitted. The trial court was correct.

2009 UT 7, ¶¶ 51–55, 210 P.3d 263, 272–73 (citations and quotations omitted).

49.    Under this standard, the court concludes that Vitamins Online is entitled to simple prejudgment interest on its common law unfair competition claim in the amount of 2.13% per annum, with accrual beginning on January 1, 2014.  Again, the court notes that this is the same interest that Vitamins Online is entitled to under its Lanham Act claim, not in addition to that interest.

## B.    Enhanced Damages/Profits

50.    Under the Lanham Act, a court is permitted to enter judgment of up to three times the actual damages or profits awarded.  15 U.S.C. 1117(a); *Earthgrains Baking Companies Inc. v. Sycamore Family Bakery, Inc.*, 573 F. App'x 676, 682 (10th Cir. 2014).  The decision to enhance damages lies within the discretion of the district court.  *See Earthgrains Baking*, 573 F.

47

App'x at 682.  Importantly, when exercising the court's discretion in deciding whether to enhance damages, the court must keep in mind that the amount of profits awarded "should constitute compensation and not a penalty."  *Novell, Inc. v. Network Trade Ctr., Inc.*, 25 F. Supp. 2d 1233, 1244 (D. Utah 1998)  (citing *Nintendo of Am. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1009–11 (9th Cir. 1994)).

51.      When assessing the equitable considerations of this case, the court concludes that an enhancement of profits is not warranted.  First, the court believes that the amount of awarded profits adequately compensates Vitamins Online such that an enhanced award of profits is not necessary.  Second, an enhancement of profits would result in a penalty against NatureWise instead of compensation to Vitamins Online.  Third, while the balance of equities in this case supports disgorging the profits that NatureWise earned in 2012 and 2013, that analysis is limited to disgorgement itself; the equitable considerations above do not require the court to also enhance the awarded profits.  Accordingly, the court declines to enhance the amount of disgorged profits awarded.

### C.      Injunctive Relief

52.      Under the Lanham Act, a court has the power to grant an injunction "according to the principles of equity and upon such terms as the court may deem reasonable."  15 U.S.C. § 1116(a).  In order to qualify for injunctive relief, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

53.     Based on the foregoing standard, the court concludes that Vitamins Online is not entitled to a permanent injunction.  The court reaches this conclusion based on the second and fourth *eBay* factors.

54.     In this case, a disgorgement of NatureWise's profits adequately compensates Vitamins Online for its injury.  Thus, injunctive relief on top of disgorgement is unwarranted.  Accordingly, the court finds that the second factor weighs against an injunction.

55.     In addition, the fourth factor weighs against an injunction.  For its injunctive relief, Vitamins Online requests that NatureWise be compelled to remove all of the Product reviews on Amazon.  However, the court finds that such a remedy would be against the public interest.  The court reaches this conclusion because, were the court to issue such an order, legitimate reviews of actual consumers would also be removed.  Thus, injunctive relief, in that respect, would not only serve as a remedy for Vitamins Online, but also a remedy against actual consumers on Amazon and the Amazon marketplace itself.  Such a result, the court believes, is not appropriate under the circumstances of this case, and goes strongly against the public interest.  Therefore, the court rejects Vitamins Online's request for injunctive relief.

### D.     Attorney Fees and Costs

56.     Under the Lanham Act, a court may award attorney fees to the prevailing party in "exceptional cases."  15 U.S.C. § 1117(a).  "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).  When considering whether to award attorney fees under the Lanham Act, a district court should consider the following nonexclusive factors: "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in

particular circumstances to advance considerations of compensation and deterrence." *Id.* at 554 n.6.

57.     Here, the court concludes that, considering the totality of the circumstances, this is an exceptional case such that an award of attorney fees and costs is appropriate and warranted. In particular, the court concludes that this case is exceptional in light of NatureWise's actions in willfully deceiving consumers, failing to produce pertinent evidence, and abusing the discovery process.  Furthermore, the court finds that an award of attorney fees and costs is appropriate in order to deter NatureWise from further engaging in such willful conduct.

58.     Therefore, within thirty days of the date this court enters judgment, the court directs Vitamins Online to file with the court all of the necessary documentation establishing the amount of attorney fees and costs that it has incurred in this case.

## NATUREWISE'S MOTION FOR JUDGMENT ON PARTIAL FINDINGS

Lastly, the court will address NatureWise's Rule 52(c) Motion for Judgment on Partial Findings.  Federal Rule of Civil Procedure 52(c) provides:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed. R. Civ. P. 52(c).  When a defendant files a Rule 52(c) motion, "the trial court is not required to consider the evidence in the light most favorable to the plaintiff."  *Roth v. Am. Hosp. Supply Corp.*, 965 F.2d 862, 865 (10th Cir. 1992).  Rather, the trial court "must undertake[] the fact finding process which involves a weighing of the evidence and an assessment of the credibility of the witnesses to determine whether or not the plaintiff has demonstrated a factual and legal right to relief."  *Id.* (alteration in original) (internal quotation marks omitted).

50

In this case, NatureWise moves for judgment on partial findings because it claims that (1) Vitamins Online lacks standing to assert the Ingredients Claims, and (2) Vitamins Online has failed to prove causation and injury as part of its Lanham Act claim.  In addition, NatureWise contends that Vitamins Online failed to present any evidence to support a permanent injunction, and that judgment is warranted as to Vitamins Online's common law claim because claims for unfair competition under Utah common law are limited to passing-off/palming-off and misappropriation.  The court will address each argument in turn.

First, NatureWise contends that Vitamins Online lacks standing with respect to the Ingredients Claims.  In support of its argument, NatureWise avers that Vitamins Online is attempting to enforce the regulations of the Food and Drug Administration ("FDA"), which retains exclusive jurisdiction to enforce its regulations.  To that end, NatureWise cites Ninth Circuit caselaw that provides:

> Because the FDCA forbids private rights of action under that statute, a private action brought under the Lanham Act may not be pursued when, as here, the claim would require litigation of the alleged underlying FDCA violation in a circumstance where the FDA has not itself concluded that there was such a violation.

*PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 924 (9th Cir. 2010).

The court finds NatureWise's standing argument to be without merit for several reasons.  First, NatureWise bases much of its argument—if not all of it—on Dr. Howe's testimony regarding Good Manufacturing Practices ("GMP").  The FDA imposes certain GMP manufacturing and labeling requirements, among other things, on product manufacturers.  Tr. 1735-36.  As demonstrated by the foregoing Findings of Fact and Conclusions of Law, however, the court does not base NatureWise's Lanham Act liability on GMPs or FDA regulations.  Rather, NatureWise is liable under the Lanham Act because its advertising claims were literally false—irrespective of the FDA regulations and GMPs.  Thus, unlike *PhotoMedex*, there is no

51

need to consider, let alone litigate, any potential underlying FDA violations. Accordingly, the court rejects NatureWise's argument and finds that Vitamins Online has standing to assert its claims.[7]

Second, NatureWise avers that Vitamins Online has failed to establish causation and injury. The court also finds this argument to be without merit based on the court's Findings of Fact and Conclusions of Law. As explained in detail above, the court has concluded that Vitamins Online and NatureWise were direct competitors in a sparsely populated market from 2012 through 2013, and Vitamins Online is therefore entitled to a presumption of injury. Because NatureWise failed to rebut that presumption and for the reasons stated above, the court finds NatureWise's injury and causation arguments to be without merit.

Third, NatureWise contends that Vitamins Online failed to present evidence supporting a permanent injunction. As explained above, the court has concluded that a permanent injunction is not appropriate in this case. That conclusion, however, is based on the entirety of the evidence presented at trial. As such, the court does not grant NatureWise's motion with respect to injunctive relief, but reaches that conclusion, as explained above, based on all of the evidence that the parties presented.

Finally, NatureWise asserts that judgment is warranted on Vitamins Online's Utah common law unfair competition claim. But the court finds this argument to be without merit. As explained above, unfair competition under Utah common law "includes—*but is not limited to*—passing off, palming off, imitating, and causing or likely causing confusion or deception."

---

[7] It also bears mentioning that, notwithstanding the fact that Vitamins Online filed this case in 2013, and the parties have gone through several rounds of motions for summary judgment over the last seven years, this is the very first time that NatureWise argues that Vitamins Online lacks standing to assert the Ingredients Claims.

*Overstock.com*, 2008 UT 55, ¶ 13, 192 P.3d 858, 862 (emphasis added).  Thus, while

NatureWise attempts to limit the definition of unfair competition, the Utah Supreme Court

explicitly stated that unfair competition is not limited to passing off/palming off and

misappropriation.  And, because the court has concluded that NatureWise's conduct constitutes

unfair competition, the court rejects NatureWise's request for judgment on Vitamins Online's

common law unfair competition claim.

Therefore, based on the foregoing reasoning and the Findings of Fact and Conclusions of

Law, the court hereby DENIES NatureWise's Motion for Judgment on Partial Findings pursuant

to Federal Rule of Civil Procedure 52(c).

DATED this 10th day of November, 2020.

BY THE COURT:

DALE A. KIMBALL
United States District Court Judge